## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

|  |  |
|---|---|
| IN RE ) | |
| ) | Case No. 09-20178-TLM |
| STERLING MINING COMPANY, ) | |
| ) | Chapter 11 |
| ) | |
| Debtor in Possession. ) | |
| _____ ) | |

**MEMORANDUM OF DECISION ON FINAL MOTION FOR
APPROVAL OF POST-PETITION FINANCING AGREEMENT**
_____

**BACKGROUND AND FACTS**

On March 3, 2009, Sterling Mining Company filed a voluntary petition for relief under chapter 11.[1] Its motion for approval of post-petition financing, *see* Doc. No. 67, came on for hearing on May 5 and 6, 2009. The Court entered a Memorandum of Decision, *see* Doc. No. 131 ("Initial Decision")[2] which determined interim financing would be approved. *Id.* at 34-35. On May 29, 2009, the Court entered an Interim Order Approving Post-Petition Financing Agreement. *See* Doc. No. 142. A "final motion" for approval of post-petition financing was

---

[1] Unless otherwise indicated, all references to chapters, sections or other statutory citations are to the Bankruptcy Code, Title 11, U.S. Code §§ 101-1532. References in this Decision to Sterling Mining Company as a prebankruptcy entity will be to "Sterling" and the post-bankruptcy entity will be referred to as the "DIP" (Debtor in Possession). *See* § 1101(1).

[2] The Initial Decision is also reported as *In re Sterling Mining Co,*, 2009 WL 1377471 (Bankr. D. Idaho May 15, 2009). It is incorporated by reference to avoid reiteration.

MEMORANDUM OF DECISION (FINANCING MOTION) - 1

filed on May 29. *See* Doc. No. 143 (the "§ 364 Motion"). It was noticed for hearing on June 23, *see* Doc. No. 144, and was one of several matters in the case presented at hearings from June 22 through June 25, 2009.

The initial § 364 motion proposed a secured credit facility to the Debtor from Minco Silver Corporation of $1,000,000 upon terms and conditions as outlined in a proposed financing agreement. The § 364 Motion now before the Court does so as well. However, the terms for the facility have been modified from the initial proposed version. Some changes were announced at the time of the May 5 and 6 hearings to address, among other things, objections of the United States Trustee ("UST"). A revised form of lending agreement was sent to creditors on May 29 along with the § 364 Motion. *See* Doc. No. 143 at Ex. B.

The § 364 Motion and revised agreement drew objections from Sunshine Precious Metals, Inc. ("SPMI") and SNS Silver Corporation. *See* Doc. Nos. 198, 202, 237, 240 (briefs).[3] No other objections were filed. While the UST had raised concerns with the initial financing request, those concerns were resolved through discussions and agreed changes in the § 364 Motion and revised agreement. The UST's counsel appeared for only a portion of the June hearings and raised no objections to the final § 364 Motion.

---

[3] From the time Sterling surrendered possession of the Sunshine Mine until July 14, 2009, SNS Silver was the entity in physical possession of the Sunshine Mine and related property by virtue of agreements between SNS Silver and SPMI.

MEMORANDUM OF DECISION (FINANCING MOTION) - 2

A further revised version of the DIP-Minco Silver financing agreement, with changes from that attached to Doc. No. 143, was admitted into evidence at the June hearings as Exhibit 123 (the "Proposed Agreement"). And, in addressing the § 364 Motion at the June hearings, counsel for Minco Silver and the DIP represented that even more changes would be made, as noted *infra*.

The Proposed Agreement now before the Court provides:

> Minco Silver hereby agrees to lend to Sterling, from time to time, for the duration of the Bankruptcy in accordance with this Agreement, proceeds under this Loan Facility subject to the conditions set out in Section 3.1 below. So long as Sterling is not in default under the terms of this Agreement or any other agreements between the parties, such funding will be available for Sterling's use as set out in Section 2.5 [*sic* § 2.4] to a maximum amount outstanding from time to time of one million dollars ($1,000,000).

*Id.* at 5 (§ 2.1). The funds advanced under this facility may be used by the DIP to pay:

(a) the costs and expenses associated with curing the defaults under the lease with SPMI;[4]

(b) the costs and expenses associated with the "Care and Maintenance Program" as defined in the Proposed Agreement; and

(c) ordinary and reasonable costs of administration of the DIP as set forth in

---

[4] An internal reference to § 2.2 is found in § 2.4(a) of the Proposed Agreement. Section 2.2 notes the prior deposit by Minco Silver of $500,000 to escrow "for the purpose of providing adequate assurance of cure and future performance by Sterling of the Sunshine Lease."

MEMORANDUM OF DECISION (FINANCING MOTION) - 3

an operating budget. *Id.* at 6 (§ 2.4(a), (b) and (c)).[5]

The facility bears interest at 10% per annum, payable monthly, and is secured by a junior lien on estate assets. *Id.* at 7 (§§ 2.6, 2.7). There are several negotiated conditions to the lending, *id.* at 8 (§ 3.1) (the "Conditions"), and the DIP agrees to perform a number of covenants, *id.* at 9-10 (§ 4.1) (the "Covenants"). The Proposed Agreement also identifies what would constitute a default under the facility. *Id.* at 10-11 (§ 5.1) (the "Defaults").

Minco Silver and the DIP agree that some items in the Proposed Agreement will be changed in any final executed agreement and/or § 364 order.

For example, among the itemized Defaults is the DIP's failure to have obtained Court orders by June 30, 2009, requiring turnover of the Sunshine Mine and authorizing the assumption of the lease with SPMI. *See* § 5.1(b), (c). Minco Silver's chief operating officer, Christopher Zahovskis, testified at hearing that Minco Silver would waive these time-limit Defaults.

Among the Covenants is the DIP's agreement to affirm and ratify the prepetition mortgages and security agreements Sterling granted Minco Silver. *See* § 4.1(c). Minco Silver's counsel represented at hearing that this provision would be altered so the DIP would not waive any prepetition claims against Minco Silver

---

[5] SNS Silver's objections to and arguments regarding limits on use of the funds in § 2.5 of the lending agreement, discussed *infra*, are now, in effect, to § 2.4 of the Proposed Agreement, Ex. 123.

MEMORANDUM OF DECISION (FINANCING MOTION) - 4

(apparently inclusive of but not limited to claims regarding these prepetition agreements and documents).

Arguments were made about two other provisions of the Proposed Agreement. These were not subject to any agreed changes at the June hearings. First, among the Conditions is an agreement that up to two representatives of Minco be appointed to the DIP's board of directors though they would not constitute a majority of the board. *See* § 3.1(d). Second, included in the Covenants is the DIP's agreement not to seek future use of cash collateral without Minco Silver's prior written consent. *See* § 4.1(f). These are addressed further *infra*.

At the June hearing, Zahovskis testified that Minco Silver was willing to lend more than what is presently provided in the § 364 Motion in order to assist the DIP in satisfying whatever obligations the Court concludes is required for the assumption of the lease and the protection of the Sunshine Mine, including the pumping of water and other efforts that were expected to be critical by September. Counsel for Alberta Star Development Corporation, Nancy Isserlis, testified that Alberta Star is also willing to provide funding to the DIP and had delivered a letter of intent discussing $3,000,000 in financing. Such funding would be in addition to Minco Silver's funding under the § 364 Motion. No motions have yet been filed in connection with either proposed additional financing.

MEMORANDUM OF DECISION (FINANCING MOTION) - 5

The Court took the § 364 Motion under advisement and has considered the objections raised, the facts and evidence as established at hearing, and applicable authorities. It concludes that the objections – with one exception – will be overruled and the § 364 Motion will be granted and the $1,000,000 credit facility thereunder approved.[6]

**DISCUSSION AND DISPOSITION**

**A.**

Though the litigants have focused on details, the context matters. Debtors in possession are entitled to seek Court approval of post-petition financing under § 364. Here, the proposal provides the lender with a junior lien on property of the estate, thus the request is made under § 364(c).

The court in *In re Farmland Industries, Inc.*, 294 B.R. 855 (Bankr. W.D. Mo. 2003), considered a modification of previously approved postpetition financing. In doing so, it summarized several accepted factors governing consideration of original and modified financing requests:

> The Court believes that the applicable factors can be synthesized as follows:
>
>     (1) That the proposed financing is an exercise of sound and reasonable business judgment;

---

[6] This Decision constitutes the Court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052, 9014.

MEMORANDUM OF DECISION (FINANCING MOTION) - 6

(2) That the financing is in the best interests of the estate and its creditors;

(3) That the credit transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtor's businesses;

(4) That the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender; and

(5) That the financing agreement was negotiated in good faith and at arm's length between the Debtors, on the one hand, and . . . the Lenders, on the other hand.

294 B.R. at 881 (utilizing factors drawn from *In re WorldCom, Inc.*, 2002 WL 1732646 (Bankr. S.D.N.Y. 2002); *In re Phase-I Molecular Toxicology, Inc.*, 285 B.R. 494 (Bankr. D.N.M. 2002); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997); and *In re The Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987)).  The Court also notes that the provisions of Fed. R. Bankr. P. 4001, and LBR 4001.1, are applicable to requests for approval of postpetition credit agreements.

**B.**

SNS Silver objects that the funding under the § 364 Motion is limited to "care and maintenance" and operations as outlined in the DIP's budget, and is not available for use in curing defaults of the lease.  *See* Doc. No. 202 at 2-3; Doc. No. 237 at 5-6.  SNS Silver repeatedly references § 2.5 of the lending agreement,

Exhibit B to the Motion, Doc. 143, as prohibiting use of funds to cure defaults. *Id.* However, § 2.5 of the agreement attached to the § 364 Motion (and its corollary provision, § 2.4 of the current Proposed Agreement, Ex. 123) provide in subsection (a) thereof that the funds may be used by the DIP to pay "the costs and expenses associated with curing" the lease defaults. This objection is not well taken.

### C.

A more sweeping objection concerns the relationship between the § 364 Motion and the DIP's motion to assume the lease with SPMI. *See* Doc. No. 43 (the "§ 365 Motion"). SPMI and SNS Silver argue that the $1,000,000 facility proposed is an insufficient amount to enable the DIP to cure the defaults and assume the lease.[7] Both SNS Silver and SPMI see the two motions as inextricably linked, and argue that if the DIP is denied the ability to assume the lease (as they contend it must be), the § 364 Motion must also be denied.

The DIP concedes that the funding under the § 364 Motion will not alone be enough to fully cure the lease and conduct care and maintenance operations at the Sunshine Mine. In fact, the § 364 Motion itself indicates further funding approval would be sought. *See* Doc. No. 143 at 7. Its counsel argued at the June

---

[7] SPMI, for example, argues that the amount required to meet Code requirements exceeds $12,000,000. *See* Doc. No. 240 at 6. The § 365 Motion, including specification of defaults that must be cured, is the subject of a separate Decision.

MEMORANDUM OF DECISION (FINANCING MOTION) - 8

hearings that supplemental funding requests would be forthcoming, and represented that they would be presented in accord with the Code and Rules. *See also* Doc. No. 239 at 20-21.

That a debtor in possession might need more money than provided in an initial financing arrangement or credit facility is not necessarily grounds for denial of approval of that facility, unless the prospects of future funding are sufficiently dim to put the reasonableness of the present request in doubt. Here, the evidence is to the contrary. Minco Silver, which has already advanced funds and has committed to the $1,000,000 in funding under the § 364 Motion, has provided evidence of a willingness to lend further amounts. Alberta Star Development Corp. provided evidence of a willingness to lend $3,000,000.[8] The Court concludes that a shortfall in covering all lease default cures and operational expenses through the $1,000,000 credit facility is an inadequate basis, on the present evidence, to deny approval of that facility.[9]

---

[8] SPMI and SNS Silver attack the testimony of Zahvoskis and Isserlis as uncorroborated, noting no letters of intent or loan agreements were introduced. A lack of written corroboration may go to weight, but it does not require the rejection of the testimony. And the cross examination of these witnesses did not impeach their testimony or cast doubts on their credibility.

[9] SPMI makes a series of arguments premised on the idea that the lending the DIP presently wants approved includes the amounts testified to by Zahovaskis and Isserlis, and that § 364 and Fed. R. Bankr. P. 4001 are violated because there has been no motion or notice to creditors of this "new" financing. The objection misses the point. Before the Court is the question of whether the $1,000,000 lending under the § 364 Motion should be approved. The other financing proposals are not before the Court for approval.

MEMORANDUM OF DECISION (FINANCING MOTION) - 9

**D.**

SPMI makes arguments concerning some of the terms in the Proposed Agreement. It asserts that § 4.1(f) – limiting the DIP's ability to apply for Court approval of nonconsensual use of cash collateral by requiring Minco Silver's prior written consent – is improper.

This Court has issued "guidelines" regarding provisions in cash collateral and post-petition financing agreements that are and are not normally approved. *See* Local Bankruptcy Rules at Appendix I. The Guidelines note the provisions that will be "scrutinized by the court even in the absence of an objection" and approved on final hearing only if there is adequate notice and cause shown.[10] Among these are provisions "that waive the right to move for a court order under Bankruptcy Code § 363(c)(2)(B) or § 364(c) and (d) authorizing the use of cash collateral in the absence of the secured party's consent." *Id.* at (b)(14). Here, notice was adequate of what the § 364 Motion proposed. However, there was inadequate cause shown for the inclusion of this provision that limits or waives the DIP's access to the Court, on proper notice and opportunity for hearing, to

---

[10] The Guidelines do not absolutely prohibit certain terms. They instead note that legitimate concerns are raised by the inclusion of such terms, and that the Court will require litigants to provide clear notice of what is proposed and, importantly, to show "cause" at hearing why the circumstances of the case support their inclusion. The inquiry is and must be case and fact specific. As *Farmland Indus.* notes, the terms of the transaction must be fair and reasonable and adequate "given the circumstances of the debtor-borrower and the proposed lender," and there is often hard bargaining required. 294 B.R. at 885-89.

MEMORANDUM OF DECISION (FINANCING MOTION) - 10

advance a request otherwise authorized by the Code. This objection will be sustained.

### E.

SPMI also contests the § 3.1(d) Condition that gives Minco Silver representation on the DIP's board of directors. The original provision required appointment of two directors. *See* Doc. No. 67 at Ex. B. The UST raised concerns over whether this Condition could eliminate the DIP's discretion to formulate a plan or administer the estate by allowing for a Minco Silver-controlled board. *See* Doc. No. 73 at 4-5; Local Bankruptcy Rules at Appendix I at (b)(9). In its most recent form, § 3.1(d) allows for "up to two" and specifically provides that "in no case will Minco representatives make up a majority of Sterling's Board of Directors[.]" Ex. 123. The UST has raised no further concerns. Given the circumstances of this case, the Court concludes the amended, minority-only provision adequately addresses the concern over a change in management control and any objections based thereon will be overruled.[11]

## CONCLUSION

The Court has considered carefully all the objections, and the briefing and

---

[11] SPMI argues that the provision is still objectionable because Minco Silver is provided impermissible access and influence on the DIP's board of directors. The Court has previously noted the history of Sterling's board of directors, including Sterling directors coming from other entities with conflicting or competing interests (including SPMI). *See* Initial Decision, Doc. No. 131 at 4-6. SPMI is not well positioned to make attacks in this vein on Minco Silver's requested minority position on the DIP's board of directors.

MEMORANDUM OF DECISION (FINANCING MOTION) - 11

argument provided both in support of and in opposition to those objections. With one exception, it finds that such objections are not well taken.

The objection to § 4.1(f) of the Covenants will be sustained. With the elimination of that Covenant, the § 364 Motion will be granted and the Proposed Agreement approved.

Counsel for the DIP may submit an appropriate form of order.

DATED: August 14, 2009

*/s/ Terry L. Myers*
TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE