# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| IN RE ) | |
| ) | **Case No. 09-20178-TLM** |
| **STERLING MINING COMPANY,** ) | |
| ) | **Chapter 11** |
| ) | |
| **Debtor in Possession.** ) | |
| _____ ) | |

## MEMORANDUM OF DECISION ON
## MOTION TO ASSUME LEASE
_____

**INTRODUCTION**

On March 3, 2009, Sterling Mining Company filed a voluntary petition for

relief under chapter 11.[1]  Following hearings on May 5 and 6, 2009, and

consideration of arguments made and the authorities that apply, the Court entered

a Memorandum of Decision.  *See* Doc. No. 131 ("Initial Decision").[2]  The Court

determined that a 2003 lease agreement, Ex. 100 ("Lease"), between Sterling and

Sunshine Precious Metals, Inc. ("SPMI") was not terminated pre-bankruptcy and

was therefore subject to assumption under § 365 of the Code.

_____

[1]  Unless otherwise indicated, all references to chapters, sections or other statutory
citations are to the Bankruptcy Code, Title 11, U.S. Code §§ 101-1532.  References in this
Decision to Sterling Mining Company as a prebankruptcy entity will be to "Sterling" and the
post-bankruptcy entity will be referred to as the "DIP" (Debtor in Possession).  *See* § 1101(1).

[2]  The Initial Decision is reported as *In re Sterling Mining Co.*, 2009 WL 1377471
(Bankr. D. Idaho May 15, 2009).  It is incorporated fully herein by reference.

The Initial Decision indicated that the DIP's motion to assume the Lease would be granted since the DIP had addressed the Code-required cure of the defaults to the extent such defaults were identified and discussed by the parties at the May hearings.  However, the Court did not enter an order approving the DIP's motion to assume the lease, Doc. No. 43 (the "§ 365 Motion"), because the assumption was subject to a further hearing to resolve any disputes as to the precise amounts required for cure of those specific monetary defaults the parties had so addressed.  *See* Doc. No. 131 at 31-33 and notes 38, 39.

Pursuant to a status conference held on June 2, *see* Doc. No. 154, a June 22 hearing was set on the remaining lease assumption issues.[3]  *See also* Doc. No. 178. The § 365 Motion was then presented during hearings spanning from June 22 to June 25, 2009.  At the conclusion of the hearing, the Court ordered simultaneous briefing to be filed by July 7.  That briefing was filed.[4]

The Court has considered the evidence, the contentions and arguments of the parties, and the applicable authorities.  This Decision constitutes the Court's

---

[3]  A number of additional issues regarding defaults, cure, and application of § 365 had been raised subsequent to the May hearings and the Initial Decision.

[4]  As occurred with its submissions on the Initial Decision, *see* Doc. No. 131 at 12 n.23, SPMI again filed an untimely "supplement" and an untimely additional brief.  *See* Doc. Nos. 246, 253.

MEMORANDUM OF DECISION (LEASE) - 2

findings of fact and conclusions of law on all contested matters.[5]

## BACKGROUND AND FACTS

Though discussed at length in the Initial Decision, the following summary of events is provided for context.

In 2003, Sterling entered into a 15 year lease agreement with SPMI[6] for real property, mineral rights, improvements and related assets generally known as the Sunshine Mine and Mill in Shoshone County, Idaho (the "Sunshine Mine"). *See* Ex. 100 at § 1.3 (defining "Property").[7] The Lease granted Sterling the right to possession and use of the Sunshine Mine, including all the ore, concentrates, metals and other minerals mined and produced from the Property, in return for payment of monthly rental of $10,000.00 and performance of other terms and conditions in the Lease. The Lease also contained an "option" under which

---

[5] Fed. R. Bankr. P. 6006, 7052, 9014. All factual findings based on or related to testimony of witnesses at the hearings on these Motions incorporate the Court's evaluation of the credibility of the witness and the weight to be given his or her testimony, even if such considerations are not highlighted in the Decision.

[6] Though the Lease is with SPMI as lessor, it recites that "American Reclamation, Inc., is the majority shareholder of [SPMI], and its consent and approval of this Lease is necessary." Ex. 100 at 1. American Reclamation, Inc., ("ARI") executed the Lease through Andrew Grundman, its vice president, who also executed the Lease as SPMI's general manager. *Id*. at 19-20. ARI was the "shareholder" of the DIP who joined with creditor SPMI in seeking dismissal of this chapter 11 case. *See* Doc. No. 296 (Memorandum of Decision determining motion to dismiss would be denied).

[7] Section 1.3 defines "Property" as "all mineral rights, title and interest of [SPMI], including leased rights, in the asset commonly known as Sunshine Mine & Mill, including equipment and all mineral and ore in place in that portion of [SPMI's] property described in [certain exhibits] and located in Shoshone County, Idaho."

MEMORANDUM OF DECISION (LEASE) - 3

Sterling could purchase the Property from SPMI for $3,000,000 to $5,000,000 depending on the spot price for silver at the time the option was exercised. *Id.* at § 20.3.

By the fall of 2008, Sterling's operations were reduced and limited to keeping the Sunshine Mine in a "ready" condition, so that it could be brought back into production. Keeping the Sunshine Mine in such an "operation ready" or potential "turn-key" condition, and protecting the mine infrastructure and equipment from being damaged by water, required ongoing ventilation and other maintenance. This required funding that Sterling was unable to fully provide.

In addition to inadequate funding, Sterling ran into other difficulties. At least two of Sterling's creditors placed liens on the Property. These liens constituted a breach of the Lease covenants. SPMI issued notices of default based on these liens and other alleged violations of the Lease's conditions and covenants. *Id.* at § 13.3, § 17.1(b).[8]

───────────────

[8] Section 13.3 of the Lease provides:

Sterling shall keep the Property free and clear of all liens and encumbrances, but may in good faith contest the validity or amount of any lien which may be levied against the Property.

Section 17 is entitled "DEFAULT; SUNSHINE'S RIGHT ON DEFAULT" and § 17.1 provides:

This Lease is upon and subject to the condition that, if Sterling shall:

. . .

(continued...)

MEMORANDUM OF DECISION (LEASE) - 4

In response to SPMI's declaration of defaults, Sterling countered with a demand for mediation in the fall of 2008 as provided for in the Lease. *Id.* at § 17.4. That mediation was unsuccessful.

This and other litigation was ongoing. During this time, Sterling's financial condition went from poor to worse. Financing even the limited amount of required maintenance operations became increasingly difficult. As discussed in the Initial Decision, Sterling surrendered possession of the Sunshine Mine to SPMI in February, 2009. SPMI thereafter retained and engaged SNS Silver Corp. ("SNS Silver") to handle the care and maintenance of the Sunshine Mine. According to the testimony of Ronald Ho, SNS Silver's chief financial officer, the possession commenced February 19, and SNS Silver was selected because it operated the adjacent Crescent Mine.[9]

The several witnesses who testified in connection with the defaults,

---

[8](...continued)

(b) Fail to observe and perform faithfully any of the other [*i.e.*, nonmonetary] covenants or agreements herein contained on the part of Sterling to be observed and performed, and any such default shall continue for a period of ninety (90) days after [SPMI] shall give Sterling written notice of such failure;

that, after the expiration of such period of time, [SPMI] may declare Sterling in default.

[9]   In connection with this engagement, SPMI and SNS Silver (via its wholly owned subsidiary) entered into an interim lease the end of February, and executed a formal lease on April 13. *See* Ex. 104. Subsequent to the Court taking the § 365 Motion under advisement, evidence was presented at hearing on August 4, 2009, establishing that SNS Silver relinquished possession of the Sunshine Mine back to SPMI on July 14, 2009.

MEMORANDUM OF DECISION (LEASE) - 5

monetary and otherwise, and the exhibits that were admitted into evidence, are set

out in the minute entries of the hearings.  *See* Doc. Nos. 219 - 222.[10]

## DISCUSSION AND DISPOSITION

The DIP acknowledges that as precondition to lease assumption, § 365

requires cure of defaults, compensation to the lessor for pecuniary loss due to

defaults, and adequate assurance of future performance.  Whether the DIP has or

can meet these requirements is the subject of significant debate.[11]

### A.    Section 365

The DIP's attempt to assume the Lease falls under and is governed by

§ 365(a) and (b).[12]  These sections provide in pertinent part:

---

[10]   To streamline presentation and resolution of the issues, the Court addresses additional factual matters and evidence, and makes further factual findings, in the discussion that follows.

[11]   SPMI argues that the "true cost to cure is $12,000,000 or more."  *See* Doc. No. 240 at 6.  SPMI's assertions are also itemized in Doc. No. 215 at 5 ($3,228,501 in cure of monetary defaults) and at 7 ($10,545,418 of nonmonetary defaults "converted" to monetary cure, for a total of $13,773,919), and in Doc. No. 246 at 6 (monetary default of $5,830,532) and at 8 (nonmonetary defaults of $7,483,787, for a total amount of $13,314,319).  These SPMI figures include, *inter alia*, $2.095 million to Private Capital Group ("PCG") and $5.222 million to Minco Silver Corp., and a $1.455 million "penalty" to the Environmental Protection Agency ("EPA") and Coeur d'Alene Tribe.  The DIP argues that the figure is $1,122,649 ($796,804 in default cure and $325,845 in adequate assurance of future performance).  Doc. No. 239 at Exs. A, B.

[12]   As a threshold matter, assumption of an unexpired lease by a chapter 11 DIP requires that assumption be in the business interest of the debtor and the estate. *See, e.g.*, *Agarwal v. Pomona Valley Med. Group, Inc. (In re Pomona Valley Med. Group, Inc.)*, 476 F.3d 666, 670 (9th Cir. 2007) (evaluating debtor's decision to reject and concluding that in the context of rejection (and, by extension, assumption), the court "applies the business judgment rule" and, further, "should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the estate.") (citing *Durkin v. Benedor Corp. (In re G.I. Indust., Inc.)*, 204 F.3d 1276, 1282 (9th Cir. 2000), and *Navellier v. Sletten*, 262 F.3d 923, 946 n.12 (9th Cir. 2001)).  The evidence presented is

(continued...)

MEMORANDUM OF DECISION (LEASE) - 6

(a)  Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)  provide adequate assurance of future performance under such contract or lease.[13]

---

[12] (...continued)
sufficient to meet that test, and requires no extended discussion.

[13]  Section 365(b)(2)(D) also addresses default and states in pertinent part:

"(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to –

. . .

(D) the satisfaction of any . . . penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the . . . unexpired lease.

MEMORANDUM OF DECISION (LEASE) - 7

## B.    Cure of defaults

In order to assume a lease, the trustee[14] must cure, or provide adequate assurance that it will promptly cure, defaults.  Certain defaults may be "monetary," for example and classically, a failure to pay the rent required by the lease.  The statute speaks differently to cure of certain "nonmonetary" defaults than it does other defaults.  *See* § 365(b)(1)(A), (b)(2)(D).  Thus, this Decision addresses monetary and nonmonetary defaults separately.

Section 365 also requires the trustee (here, the DIP) to compensate, or provide adequate assurance that it will promptly compensate, "a party other than the debtor to such . . . lease" for any actual pecuniary loss resulting from such default.  *See* § 365(b)(1)(B).  The Court therefore considers what monetary defaults must be cured or pecuniary losses remedied through the DIP's payment of funds.  Both categories – failure to pay amounts required by the lease to be paid, and pecuniary loss suffered by the lessor as a result of a default – are addressed here under the umbrella of "monetary defaults."

### 1.    Monetary defaults

The evidence establishes that the defaults under the Lease that can and should be cured by payment to SPMI – who is the "party other than the debtor to

---

[14]  The chapter 11 DIP exercises the trustee's rights under this section.  *See* § 1107(a).

MEMORANDUM OF DECISION (LEASE) - 8

such contract or lease" under § 365(b)(1)(B)[15] – fall within several categories.

### a.      Rent

The Lease requires Sterling to pay of rent of $10,000.00 per month to

SPMI.  *See* Ex. 100 at § 9.1.  The failure to pay rent is a monetary default.

Though the monthly rent payments were current at the time of the petition for

relief, the DIP has not paid rent since filing.  The DIP acknowledges that it must

cure this default.  The accrued rent from March through August, 2009, totals

$60,000.00.

### b.      Property taxes

The Lease requires Sterling to pay "all ad valorem, property taxes, and

other governmental charges applicable to the Property."  Ex. 100 at § 13.2.

Though not payable to SPMI, the payment of taxes on the leased Property protects

the lessor's interest in the property, and is a typical monetary default.  The DIP has

agreed that the same must be paid.

Shoshone County has a real and personal property tax claim listed on the

DIP's schedules that is approximately $113,000.00.  Ken Rux[16] testified that,

following a line item review of the County's tax claim, approximately $70,000

---

[15]  By its terms, the statute excludes from the ambit of monetary default and compensable pecuniary loss the claims of those who are *not* a party to the subject lease, such as SNS Silver. SNS Silver's claims are addressed *infra* under different statutory authority.

[16]  Rux was Sterling's former chief financial officer.

MEMORANDUM OF DECISION (LEASE) - 9

falls within the definition of the leased Property under § 1.3 of the Lease. The

DIP acknowledges that a variance may exist, but the final amount will be paid.

Doc. No. 239 at 3.

### c.    Liens

Mechanics' liens are asserted by two creditors. The DIP agrees that both

must be paid or satisfied. *See* Lease at § 13.3. The first, asserted by Atlas Faucett

Contracting, is in the amount of $130,572.47 as of June 15, 2009. *See* Ex. 220.

The second is asserted by Miller Sales & Engineering in the amount of

$150,966.68 as of July 31, 2009. *See* Ex. 225. The DIP, as noted, concedes

payment is required.[17]

### d.    EPA

The Lease provides:

> Sterling, in conducting operations on the Property, shall comply with
> all Federal, State and local laws and regulations pertaining to
> operations on the Property. Sterling will indemnify and hold harmless
> Sunshine [SPMI] for any fines, levies, or other expenses related to
> Sterling's possession of the Property. This includes reasonable
> attorney's fees and defense expenses.

*Id.* at § 13.5.

SPMI raises several issues related to Sterling's compliance with EPA

---

[17]   Additional interest will have accrued since the dates of the lien creditors' payoff
statements. This will increase the amount to be cured from the figures cited. The DIP suggests
that, through negotiation, it may be able to reduce these payoff amounts. For the purposes of this
Decision, the payoff amounts provided by the lien creditors will be used without adjustment,
though recognizing they are but estimates of the final figure that would be paid.

MEMORANDUM OF DECISION (LEASE) - 10

regulations.  The first is alleged liability for an event characterized by the

witnesses as the "Big Creek spill."  There are also questions regarding liability to

the EPA (and the Coeur d'Alene Tribe) under a partial consent decree, and of

"penalties" under that same decree.  The latter two issues are considered here

given the common factor of the EPA as an obligee.

### i.    Big Creek

SPMI and the DIP debate the extent of liability for the 2008 Big Creek

spill.  SPMI argues the assessment or fine for this spill could be as much as

$5,000,000, and Rux testified that it could have been as much as $3.1 million.

However, Robert Higdem, the environmental manager for Sterling, and Rux both

credibly testified that the final asserted fine by the EPA, even though not yet

reduced to an executed document, would be no more than $50,000.00.  *See also*

Ex. 107.  SPMI did not prove there was a fine in any amount greater than the

$50,000.00.  While the documents may not yet be finalized, the DIP did not

dispute that the liability had been negotiated and was owed.  It is therefore

included among the defaults to be cured.[18]

### ii.    Consent decree payments

Under a "partial consent decree," there are royalties that must be paid to the

---

[18]  This liability was omitted from both SPMI's and the DIP's summaries of defaults to
be cured.

MEMORANDUM OF DECISION (LEASE) - 11

EPA and to the Coeur d'Alene Tribe (in equal shares).  *See* Ex. 218.  The DIP

concedes $382,020.95 is owed under this provision of the decree.[19]

### iii.    Consent decree penalties

The partial consent decree also contains a methodology by which

"penalties" are calculated for the failure to timely pay the royalties.  Ex. 218 at 20.

Under that methodology, the penalties could be as much as $1,455,000.00.  *See*

Ex. 245.

Robert Higdem and Ken Rux testified that their and Sterling's prior

experience with the EPA leads them to believe that any penalties under this

provision might be subject to reduction through negotiation.[20]  In any event, the

evidence does not indicate that such penalties have yet been declared or asserted.

On this state of the record, it is impossible to ascribe a precise figure to this

category of asserted default that must be paid by the DIP as a condition of

assumption.

---

[19]   Rux testified that it fell under § 5.1 of the Lease.  However that section deals with the
"representations and warranties" of SPMI, with § 5.1.2 disclosing that "[t]here are certain Royalty
Agreements in effect[.]"  The liability of Sterling as a lessee or as a successor to SPMI is not
addressed in § 5.1 nor is it discussed in connection with Sterling's payment obligations under the
Lease.  *See id.* at §§ 9.1 - 9.4.  It is arguable that it falls under § 13.2 ("other governmental
charges applicable to the Property") or § 13.5, quoted earlier.  In any event, the DIP does not
dispute it owes the royalty amounts under this decree.

[20]   This prior experience would evidently include the reduction of the fine for the Big
Creek spill from a potential $3,100,000 to $50,000.00.  The DIP argues that it also includes the
nonassertion of penalties by the EPA and Tribe against its predecessor, SPMI, under the same
partial consent decree.

MEMORANDUM OF DECISION (LEASE) - 12

If the EPA and Tribe assert claims to penalties, the amounts thereof, as established under the partial consent decree's terms or through negotiation, would have to be paid by the DIP given its obligation under § 13.5, something the DIP concedes. But when this would occur, or the amounts required to meet this obligation, are presently uncertain.[21]

Though the potential exposure is large, the testimony of Nancy Isserlis and Christopher Zahovskis, discussed further below, indicates Alberta Star Development Corp. and Minco Silver, respectively, are willing to extend post-petition financing in significant amounts beyond the $1,000,000 that was before the Court in the DIP's recently approved § 364 Motion. *See* Doc. No. 310.[22]

---

[21]   In its untimely briefing, Doc. No. 253, SPMI argues that the DIP failed to give notice of the § 365 Motion to the EPA or the Coeur d'Alene Tribe. *Id.* at 1-2. The record only partially supports this assertion. The § 365 Motion was served on the EPA. *See* Doc. Nos. 45, 50 (listing EPA at multiple addresses). The Tribe, however, does not appear to have been served according to the certificates of service. *Id.* Nor is the Tribe on the master mailing matrix in this case. (The Tribe did appear through counsel on August 4, 2009, to observe hearings in this matter, and made similar points regarding lack of notice.)

SPMI seems to suggest the absence of notice to the Tribe is a fatal flaw. The Court concludes that, under the circumstances, it is a flaw, but not fatal. The DIP has agreed that the royalties must be paid. And though the precise parameters of the EPA/Tribes' claim(s) under the penalty provisions of the partial consent decree have yet to be set, they will not be determined by the Court in the present aspect of the litigation. Such matters can be heard, as appropriate, at a later time and upon proper notice. The only issue, at present, is the magnitude of potential liability that must be considered under the adequate assurance of future performance provisions of § 365(b)(1)(C).

[22]   SPMI attacked Isserlis' and Zahovskis' testimony because (a) it was not corroborated by a written letter of intent or agreement and (b) the DIP has not sought Court approval for such additional lending under § 364. Neither factor requires the Court to reject or ignore the testimony given. Both witnesses testified credibly that their respective entities were committed to funding. The lack of written corroboration goes, if at all, to weight. Since approval of additional financing
(continued...)

MEMORANDUM OF DECISION (LEASE) - 13

Because the possible penalty of $1,455,500 is at present unasserted and unliquidated, there is no extant monetary default that must be cured. The penalty portion of the liability under the partial consent decree is therefore unlike the base royalty under that same decree, which the DIP admits is a monetary default that must be cured. If a penalty is asserted, the DIP will need to deal with the same. However, because the DIP has provided testimonial evidence of preliminary commitments of additional post-petition financing, the Court concludes that – at the present time – this exposure to a potential penalty under the partial consent decree does not require denial of the § 365 Motion.

### e.    Utilities

Section 9.4 of the Lease provides that "Sterling shall be responsible for all utilities applicable to the Property."

Gayle Kimsey-Gonser, an account manager for Avista, testified that, if the utility accounts were transferred from SPMI to the DIP, a deposit of $143,960.00 would be required. This falls within the rubric of adequate assurance of future performance of a DIP-assumed Lease. The amount of $140,960.00 will be included in this Decision, since testimony indicates $3,000.00 of the estimated deposit relates to a building not on the site subject to the Lease.

---

[22] (...continued)
is not presently being requested, the absence of a supplemental § 364 motion is not consequential.

MEMORANDUM OF DECISION (LEASE) - 14

While there was no evidence submitted as to unpaid pre-petition utility bills, the schedules filed by the DIP list a total of $177,900.00 owed to Avista. Some unestablished portion of this figures undoubtedly relates to the Property as defined in § 1.3 of the Lease.[23]  Given the state of the evidentiary record, the Court concludes that the portion of the $177,900.00 related to the Property under the Lease should be included within the required cure amounts.[24]

### f.      MSHA/EPA violations

As noted, § 13.5 of the Lease requires Sterling's compliance with Federal and State laws and regulations.  SPMI argues that there are environmental and safety problems, constituting violations under EPA or Mine Safety & Health Administration ("MSHA") regulations.  These matters were subject to extensive and conflicting testimony.

Steve Radvak testified on behalf of SPMI, and his report was introduced as Ex. 211.  Based thereon, SPMI asserts that an amount of $1,511,500.00 will be required to evaluate and remediate environmental contamination problems at the Sunshine Mine.

---

[23]   Unlike the situation with the deposit, Rux was not asked to testify as to the amount of the pre-bankruptcy Avista claim that related to other than Lease property.

[24]   Absent a more workable option, the Court will include the entire $177,900.00 in its totals.  However, it does so noting that the pre-petition utility claims on real or personal property, other than that covered by or under the Lease, are subject to treatment as claims under a plan or as the Code otherwise might provide.

MEMORANDUM OF DECISION (LEASE) - 15

Expert testimony is governed by Fed. R. Evid. 702.  The standards related to Rule 702 are established by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  The same were analyzed by this Court in *In re Smitty Investment Group, LLC,* 08.2 I.B.C.R. 67, 2008 WL 2095523 (Bankr. D. Idaho 2008).  The standards are important because the Federal Rules of Evidence "'grant expert witnesses testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" 2008 WL 2095523 at *8 (quoting *Kumho Tire*, 526 U.S. at 148) (internal quotation marks omitted).

Those standards first require evidence establishing that the witness has the education, training or experience necessary to be considered an expert in a given field or area.  *Id.* at *8-9.  Radvak's work experience and training meets those standards.

However, the ability to render an admissible expert opinion requires not just the background and training, but also the proper and reliable application of such training to the facts.  "[T]he reliability standard requires an opinion be based on sufficient facts or data, and be the product of reliable principles and methods properly applied.  Thus, an opinion should be excluded if 'speculative or conjectural' or if it 'makes no effort to account for major variables.'" *Id.* at *10 (citing *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003)).  *Smitty*

MEMORANDUM OF DECISION (LEASE) - 16

further observed that the opinion testimony of an expert does not merit

consideration and "should . . . be excluded if it 'is connected to existing data only

by the *ipse dixit* of the expert' because the court is entitled to consider and

'conclude that there is simply too great an analytical gap between the data and the

opinion proffered.'" *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146

(1977)).[25]

Radvak's testimony reflected a lack of adequate facts or data, and a lack of

reliable application of expertise to such data.  Radvak visually inspected the

above-ground areas of the Sunshine Mine.  His visual review identified several

areas where he suspected contamination might have occurred or be present.  He

relied, in many instances, upon observations of what he believed to be oil or other

fuel spills on the ground.  In other circumstances, he determined that the physical

layout (e.g., of pipes, conduits, concrete slabs, etc.) either implied prior

contamination that Sterling had attempted to rectify or a potential for future

contamination.

Radvak did not, however, conduct testing to determine the existence or

extent of any suspected contamination.  At bottom, that there was in fact any

contamination constituting a violation of EPA statutes and regulations is the

---

[25]   The Court has broad discretion whether to discredit expert opinion if it is not reliable
or does not aid the fact finder in its task.  *Kumho Tire*, 526 U.S. at 152 ("The trial judge must
have considerable leeway in deciding in a particular case how to go about determining whether
particular expert testimony is reliable."); *see also Elsayed Mukhtar v. Cal. St. Univ.*, 299 F.3d
1053, 1063 (9th Cir. 2002).

MEMORANDUM OF DECISION (LEASE) - 17

subject of surmise or speculation.  While Radvak may be able to make "educated" guesses given his expertise, that makes them no less guesses in the circumstances established by the evidence here.

These problems are only compounded when it comes to Radvak's estimates of the amounts required for remediation of the problems he identified.  Without having identified and established the extent of a suspected spill, contamination, or other environmental problem, his estimates of the projected cost to remediate are without sufficiently reliable and credible basis.  The magnitude of this problem is illustrated by the fact that Radvak's report and testimony ascribed very large amounts (sometimes several hundreds of thousands of dollars) to address an alleged problem but without explanation of how the figures were calculated or on what they were based.

Having considered and carefully reviewed the testimony and exhibits, the Court concludes the noted problems permeate the whole of Radvak's testimony and conclusions.  The Court is unable to parse from Radvak's report and testimony those costs that are sufficiently proven for inclusion in the default cure.  Therefore no amounts, as asserted by SPMI through Radvak's testimony and report, will be included in § 365 monetary cure amounts.[26]

---

[26]  These findings and conclusions do not necessarily mean that there are no environmental issues, only that the extent of any such issues were not proven in connection with establishing the amounts of monetary defaults that must be cured as a condition of assumption. The DIP agrees that it must comply with the requirements of § 13.5 of the assumed Lease.  That

(continued...)

MEMORANDUM OF DECISION (LEASE) - 18

Robert Higdem, the DIP's environmental manager, acknowledged that a pipe from the Jewell Adit to the tailing pond, extending over Big Creek, needed to be repaired.[27]  He estimated the amount to do so at $15,000.00 to $20,000.00.  He also estimated another $1,500.00 for relocation of a cabinet.  Given Higdem's testimony, which was solicited by the DIP, $21,500.00 will be included as a monetary default that must be cured.[28]

Similar contentions regarding MSHA violations were urged in light of the testimony of Dean Roy.[29]  Roy conducted an inspection of the Sunshine Mine in May, 2009.  Roy's testimony focused on his observations from that inspection of conditions that might represent environmental or MSHA problems, including such items as oil and diesel fuel storage.  However, Roy's testimony lacked preponderating clarity about whether there were in fact present MSHA

---

[26] (...continued)
compliance almost certainly will have a cost, as Robert Higdem's testimony concedes.  The question at this stage is one of adequate assurance of future performance.  Given the amounts presently proven, the DIP's financing of future operations under the § 364 Motion and in light of the testimony regarding prospective funding, provides such assurance.

[27]  Higdem's credentials to testify as an expert on environmental issues, established on June 25, were as strong as Radvak's if not more so.

[28]  SPMI's submissions also suggest that the cost it paid Radvak for the report should be included in the "environmental" amounts the DIP must pay.  (SPMI's brief references a $4,275.37 cost and cites to Ex. 241, however that exhibit was not offered or admitted.)  Because this claimed expense is essentially a cost of litigation incurred by SPMI, it is addressed below.

[29]  Roy had 32 years of work experience in the Galena Mine when he retired as maintenance supervisor.  He worked eleven of those years was as an environmental manager.  He dealt with MSHA issues in his work, though not EPA issues.  He reported suspected MSHA or other violations to the environmental engineer.

MEMORANDUM OF DECISION (LEASE) - 19

violations.[30]  Moreover, the testimony did not establish a particular monetary amount to be cured.

### g.    BLM assessments

The Lease requires annual assessment work.  *See* Ex. 100 at § 13.6.2. SPMI asserts that the amount presently due and at issue is $7,500.00.  The DIP contends the assessments are due annually starting September 1.  Section 13.6.2 confirms this timing (*i.e.*, "Beginning with the annual assessment work period ending September 1st, and for each annual assessment work period commencing during the term of this Lease[.]").  There was no proof that a prior year's assessment is outstanding and should be included within the current monetary defaults.  Under the evidence, therefore, it is a question of the DIP paying a future assessment (apparently one of $7,500.00 this coming month).  The adequate assurance of future performance of this obligation is established given the financing the DIP has obtained.

### h.    Conversion/disposal of personal property

SPMI offered the testimony of Douglas Burmeister and Brad Sawyer in an attempt to prove that certain personal property, including scrap metal, was removed from the Sunshine Mine and Property and sold by Sterling.  Not only

---

[30]  To the extent the testimony is viewed as suggesting areas that would need to be monitored or evaluated for potential MSHA problems, the DIP's witnesses indicated such an evaluative process had previously been part of their regular care and maintenance of the facility, and would again be implemented upon gaining possession of the Property.

MEMORANDUM OF DECISION (LEASE) - 20

was the testimony inconclusive about what precisely was sold, there was a dearth of preponderating evidence that the property belonged to anyone other than Sterling,[31] or that the removal and sale, to the extent it occurred, was wrongful or caused SPMI injury. More importantly, there was no evidence that, even if there was a "claim" of SPMI against the DIP in regard to this personal property, it related to the Lease or constituted a default under the Lease or represented a pecuniary loss of SPMI due to a Sterling default of the Lease. Without reaching a decision on any potential claim litigation on these matters, the Court concludes that there was no Lease default proven regarding removal of chattels.

### i.    SPMI attorneys' fees and costs

Under the Lease, Sterling shall "comply with all Federal, State and local laws and regulations pertaining to operations on the Property" and it shall "indemnify and hold harmless Sunshine for any fines, levies, or other expenses related to Sterling's possession of the Property." Ex. 100 at § 13.5. The next line of the section, providing that "*This includes* reasonable attorney's fees and defense expenses," is necessarily in reference to the preceding sentence's "fines, levies, or

---

[31] The Lease provides: "All machinery and equipment having a cost in excess of five thousand ($5,000.00) dollars, and all inventory or other supplies acquired by Sterling after the Effective Date exclusively for operations on the Property subject to this Lease shall be owned by Sterling and shall rest solely in Sterling." Ex. 100 at § 12.1. Under § 12.2, "[o]n termination of this lease," Sunshine is given an option to purchase the § 12.1 property at its then market value as established by independent appraisal. As previously determined by the Court, the Lease was not terminated.

MEMORANDUM OF DECISION (LEASE) - 21

other expenses[.]"[32]  SPMI has not identified fees that must be allowed under

§ 13.5's limited scope.

Fees are also addressed in § 21.3 of the Lease, which provides:

For any action, the prevailing party shall be entitled to reasonable
attorneys' fees.  Venue for any action shall lie in Shoshone County,
Idaho.

This provision follows § 21.1 addressing consensual resolution or judicial

determination of "any question . . . with respect to any matter or thing whatsoever

covered by or pertaining to this Lease[.]"

SPMI claims the following fees and costs:

(1)    Fees and costs of Murphy Bantz & Bury, P.S. in the amount of
$22,806.08 (Ex. 226);[33]

(2)    Fees and costs of Michael Reagan in the amount of $33,857.73 (Ex.
222);[34]

(3)    Costs of Edward Short and Jess Collazo in the amount of $47,100.00

---

[32] SPMI notes that § 24.7 acknowledges that the "Lease was prepare [*sic*] by the attorney
for Sterling," and, therefore, SPMI argues that § 13.5 should be construed against any limiting
construction.  However, the Court does not find § 13.5 to be ambiguous.  Pursuant to § 13.5,
SPMI is entitled to attorneys' fees related to any fines, levies or other expenses related to
Sterling's possession of the Property.

[33] The exhibit establishes that all claimed fees were post-petition in nature, rendered
from March 28, 2009 through May 28, 2009.  The DIP acknowledges that they are reasonable in
amount, and that they all "relate to the Lease," but argues that there is no showing that SPMI was
the prevailing party on Lease issues.  *See* Doc. No. 239 at 16.

[34] Exhibit 222 was not offered, though it was discussed.  The same was true of Ex. 244
consisting of Reagan's invoices.  Reagan's services involved several matters of state court
litigation as well as services after the bankruptcy was filed, ranging from August 18, 2008
through June 3, 2009.

MEMORANDUM OF DECISION (LEASE) - 22

(Ex. 234);[35]

(4)     Fees and costs of C.K. Powers, P.S. in the amount of $34,180.68
        (Ex. 223);[36] and

(5)     Costs for preparation of Radvak's report in the amount of $4,275.37.

Though a number of exhibits before the Court are pleadings from

prebankruptcy state court litigation, the Court has not been directed to any exhibit

containing or reflecting a ruling by the state court that SPMI was the prevailing

party in that litigation.  This is not, therefore, a situation where the evidence

indicates that prior rulings on entitlement of fees have been made, and the fees so

awarded to SPMI as a prevailing party would be among the monetary lease

defaults that must be cured.[37]

The question then becomes whether this Court can render determinations

---

[35]   Though discussed by the parties as a fee and cost issue, neither Short nor Collazo acted as attorneys for SPMI.  Exhibit 234 indicates that they were "consultants" and inspected the Sunshine Mine and certain "books and records."  Short states: "Jess [Collazo] and I have also spent time and rendered assistance to the attorneys (neither Jess Collazo nor myself have acted as attorneys for SPMI) representing SPMI in various state court actions arising out of or in connection with the Mine Lease."  *Id.* at 1.  There are no details regarding the dates services were rendered, or descriptions of services.  There is but a "summary" asserting that Short worked 440 hours at $75.00/hour ($33,000.00) and that Collazo worked 235 hours at $60.00/hour ($14,100.00) and "invoiced" those charges to SPMI.

[36]   Only post-petition services were rendered by members of this firm, running from May 28, 2009 to June 12, 2009.  Virtually all services were related to SPMI's motion to dismiss the chapter 11 case.

[37]   *See, e.g.*, *In re Shangra-La Inc.,* 167 F.3d 843, 849 (4th Cir. 1999) ("Entitlement to attorneys' fees . . . is dependent on the terms of the lease and on state law; § 365(b)(1)(B) does not create an independent right to an award of attorneys' fees."); *In re Dailey*, 289 B.R. 157, 159 (Bankr. D. Mont. 2003) (allowing prepetition fees, provided for in lease, as part of cure required when debtor in possession was allowed to assume lease under § 365).

MEMORANDUM OF DECISION (LEASE) - 23

on which party prevailed.  Insofar as the pre-bankruptcy state court litigation is
concerned, it declines to engage in the attempt.[38]  The state court hearing the
matter is in the best position to evaluate the several factors that attend not only
determining the identity of the prevailing party but also the reasonableness and
amount of the fees to be allowed.

A different issue, however, is presented in connection with the litigation
before this Court.  Several issues have been tried and determined following the
commencement of the bankruptcy case.  This Court is fully aware of the conduct,
and results, of that litigation.

The authorities establish that determining who prevailed is committed to
the sound discretion of the Court.  In exercising that discretion, the Court should
consider the final judgment or result of the action in relation to the relief sought by
the respective parties, and may determine that a party prevailed in part and
apportion fees accordingly.  *JB Constr., Inc. v. King (In re King)*, 2009 WL
790160 at *2-3, 09.1 I.B.C.R. 32, 33 (Bankr. D. Idaho Mar. 23, 2009) (citing Id.
R. Civ. P. 54(d)(1)(B), (c)(1), and *Decker v. Homeguard Sys.*, 666 P.2d 1169,
1172 (Idaho Ct. App. 1983).[39]

---

[38]  Even assuming it would have the right to adjudicate this question, the Court was not
given sufficient evidence to do so.

[39]  Despite the ability to apportion fees for a party "prevailing in part," the Court has also
noted that it should take "an overall view, not a claim-by-claim analysis."  *Kilborn v. Haun (In re
Haun)*, 396 B.R. 522, 530, 08.4 I.B.C.R. 155, 158 (Bankr. D. Idaho 2008) (citing *Eighteen Mile*
(continued...)

MEMORANDUM OF DECISION (LEASE) - 24

In general, SPMI has not been the prevailing party in litigation before this

Court in:

(a) arguing the Lease was terminated prior to bankruptcy and thus the DIP

held no interest capable of assumption;

(b) urging its own "motion to reject" the Lease;

(c) opposing approval of the DIP's § 364 financing motion;

(d) urging a motion to dismiss the bankruptcy;

(e) advancing, then withdrawing, a motion to appoint a trustee;

(f) opposing the DIP's complaint and a motion for turnover; and,

(g) arguing the DIP's inability to assume the Lease and proposing the

amounts that must be paid as a condition of assumption, as addressed in the instant

Decision.

Within each of these broad litigation categories, there were discrete claims

or theories argued.  However, consistent with *Haun*, the Court does not evaluate

success or failure on each such claim or contention, but rather looks to the

litigation as a whole.  So viewed, the prevailing party prerequisite to attorneys'

fees under § 21.3 of the Lease is not established, and the entitlement to attorneys'

---

[39] (...continued)
*Ranch, LLC v. Nord Excavating & Paving, Inc.*, 117 P.3d 130, 133 (Idaho 2005)).  Context
reveals that this is not as inconsistent with the holding of *King* as it might first seem.  In *Haun*,
the question was presented where a plaintiff prevailed in dischargeability litigation under § 523(a)
(through a stipulated judgment found to be premised on § 523(a)(2)), and the question was
whether the failure to recover on the plaintiff's § 523(a)(4) and § 523(a)(6) claims was relevant to
the issue of "prevailing" for purposes of an award of attorneys' fees.

MEMORANDUM OF DECISION (LEASE) - 25

fees and costs is not shown.[40]

None of the attorneys' fees and related costs claimed by Reagan, by Murphy Bantz & Bury, and by C.K. Powers will be allowed as a component of the monetary defaults under the Lease to be cured, based on the absence of any finding (by this Court in connection with bankruptcy litigation, or by any state court in connection with pre-bankruptcy litigation) that SPMI was the prevailing party.[41]

The asserted claim regarding Short and Collazo is subject to the same ruling, whether this is a "cost" claimed by SPMI or one or more of the law firms asserting attorneys' fees claims. The Short and Collazo claim is further deficient in that (a) they did not perform legal services, (b) it was not established that they performed compensable "paralegal" services, and (c) there is a lack of itemization or justification for allowance of the several hundred hours of unspecified services or labors.

SPMI's out-of-pocket costs for the Radvak report are also denied on the basis that SPMI was not the prevailing party in connection with the issues so addressed.

---

[40] *See also Dailey*, 289 B.R. at 160 (holding that when lease assumption was allowed by the court over the objection of the lessor, the lessor was not the prevailing party and could not claim fees pursuant to a provision in lease for defense of the § 365 motion or for its objections to disclosure statement, requests for 2004 examination, and other bankruptcy litigation).

[41] This ruling obviates the need to explore the DIP's arguments that certain services involved matters not "related to the Lease."

MEMORANDUM OF DECISION (LEASE) - 26

The total monetary defaults that must be cured, as determined by the Court

and set out in the foregoing discussion, are summarized in the Conclusion, *infra*.

### 2.    Nonmonetary defaults

As noted, the Code treats certain defaults differently.  *See* § 365(b)(1)(A).

SPMI and SNS Silver argue that certain of the defaults are "noncurable" and that

the DIP's motion must therefore fail.

A well-accepted bankruptcy treatise explains:

> A contract or lease may be subject to a noncurable default but may not
> have terminated under state law.
>
> This raises important questions concerning the cure under
> section 365(b).  Must the cure of a default be upon the terms, and
> within the time, set forth in the contract or lease?  Alternatively, is a
> cure of a default possible if there is no cure provision in the agreement?
>
> The answer seems to be that the Code provides a broad right to
> cure, regardless of whether the agreement itself would permit cure.
> The idea of cure in the Code is to provide the other party to the contract
> with the benefit of its economic bargain.  This suggests that if the
> trustee is able to provide a remedy that offers the other party to the
> contract the substantial equivalent to its economic rights under the
> contract, the trustee will have provided an adequate cure and, if the
> trustee complies with the other provisions of section 365(b), will be
> able to assume the contract or lease.
>
> By their nature, certain nonmonetary defaults are not curable.
> For example, the prepetition breach of a continuous operation clause
> in a real estate property lease cannot literally be cured, because the
> trustee cannot go back in time and cause the debtor to operate in the
> past during the time that it did not operate.  It was generally understood
> that a 1994 amendment to the Code, which added section 365(b)(2)(D),
> was intended to relieve the trustee of the obligation to cure such a
> default.  However, the provision was poorly and ungrammatically
> drafted and so led to confusion.  In *Claremont Acquisition Corp.* [113

MEMORANDUM OF DECISION (LEASE) - 27

F.3d 1029 (9th Cir. 1997)], the Court of Appeals for the Ninth Circuit read the provision to require cure of such a default, thereby preventing the trustee from assuming a real property lease under which the debtor had violated a continuous operation clause.

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended section 365(b)(1)(A) to overrule the result, although not the statutory reading, in *Claremont Acquisition*.  Section 365(b)(1)(A) specifically exempts from the cure requirement the cure of "a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption."  The provision retains much of the awkward and indecipherable flavor of section 365(b)(2)(D): "a default that is a breach of a provision relating to the satisfaction of any provision . . .  relating to a default arising from any failure to perform . . . ." leaves the reader somewhat breathless, as well as perplexed as to what was intended.  It is suggested, however, that the reference to nonmonetary obligations and the impossibility of cure by subsequent performance means that the provision relates to continuous operation provisions and other provisions that are similar in that they involve nonmonetary obligations and cannot be retroactively cured.  Certainly all the bankruptcy and financial condition defaults described in section 365(b)(2) would fall within that group were they not covered separately.

3 Collier on Bankruptcy ¶ 365.05[3][b], [c] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2005).

The two primary nonmonetary defaults asserted are Sterling's prepetition financing and security agreements with Minco Silver and with Private Capital Group, Inc. ("PCG").  *See* Ex. 202 at internal exhibits (Minco Silver); Exs. 216, 217 (PCG).  SPMI argues that both agreements violated § 20.2 of the Lease, which states:

MEMORANDUM OF DECISION (LEASE) - 28

> Sterling may only assign its interest, or a portion thereof, in this Lease to any third party with the express written consent of Sunshine, which consent shall not by unreasonably withheld. The third party shall accept and covenant to Sunshine that it will perform the obligations as if it were a party to this Lease.

The DIP contends the PCG agreement, Ex. 216, acknowledges the Lease terms by requiring Sterling to make its "best efforts" to obtain SPMI's consent to that agreement. The "All Assets Security Agreement" with PCG defines collateral as including

> Leasehold rights, excepting the Sunshine Precious Metals Lease dated June 6, 2003, which Lease requires the consent of Lessor prior to assignment of Lease. Such consent shall not be required of Borrower [Sterling] to obtain unless and until an Event of Default occurs. Should an Event of Default occur, Borrower covenants that it shall use its best efforts to obtain Lessor's consent to an assignment of the Lease and upon receiving consent, Borrower shall execute a Borrower's Assignment of Lease to Lender and said Assignment shall then be recorded in the official records of Shoshone County, Idaho.

Ex. 216 at 3, § 5(m).

Similarly, the DIP argues that the agreement with Minco Silver is not violative of § 20.2 because the assignment of lease document prepared for use in connection with that facility, Ex. 202 at Ex. B at sched. C, is expressly ineffective without SPMI's consent. Further, the related Credit Facility Agreement recognizes that an assumption agreement would be signed but held by Minco Silver in trust and in abeyance until a default occurred and subject to SPMI's consent to assignment. *See* Ex. 202 at Ex. B, p. 5-6, § 2.6(b). That provision further states: "It is specifically agreed that nothing in this Agreement is intended

MEMORANDUM OF DECISION (LEASE) - 29

to be construed as an immediate assignment or pledging of the Sunshine Lease."

*Id.*

The existence of a Lease default under § 20.2 requires an "assignment" without SPMI's consent.  The documentation indicates the DIP and Minco Silver/PCG recognized SPMI's right of "express written consent . . . not unreasonably withheld" and conditioned any assignment upon such consent. Therefore, the Court finds no assignment occurred that violated the Lease.

### 3.    Adequate assurance of future performance

Finally, the DIP must provide adequate assurance of future performance under the Lease.  *See* § 365(b)(1)(C).  This requires evidence that the DIP will be able to perform the Lease, if assumed, on an ongoing basis.  *See In re Martin Paint Stores*, 199 B.R. 258, 263 (Bankr. S.D.N.Y. 1996) (concluding that "adequate assurance" must be given a pragmatic construction and "[a]t a minimum, the primary focus of adequate assurance concerns the assignee's ability to fulfill the financial obligations under the lease").

Several of the items within this category have already been addressed. These include monthly Lease payments of $10,000 to SPMI, insurance, utilities, taxes, and the like that are not just prior obligations (and defaults to be cured) but ongoing obligations as well.  Expenditures necessary to meet the federal, state and local regulations, including environmental and MSHA requirements, are also included.

MEMORANDUM OF DECISION (LEASE) - 30

While there was testimony that the "carrying cost" of the mine could be as high as $250,000 per month, the DIP's budget submitted in connection with the post-petition financing suggests a slightly more modest figure. *See* Doc. No. 67 at Ex. A.[42]

On August 14, 2009, the Court approved the DIP's post-petition financing of $1,000,000 from Minco Silver. The testimony of Isserlis and Zahovskis is adequate to support the concept that the DIP can obtain additional financing as needed to finalize and consummate cure of the Lease, pay the operating and maintenance expenses, and advance reorganization, thus providing adequate assurance that the lease will be performed.

### C.    SNS Silver's claims

SNS Silver came into possession of the Sunshine Mine and related Property on or about February 19, 2009. It remained there until July 14, 2009, when it gave possession back to SPMI.

At the hearings in late June, SNS Silver asserted that it incurred and should be reimbursed numerous expenses. Certain of the expenses are itemized on Exhibits 301 through 327. SNS Silver also asserted through the testimony of Ronald Ho, its chief financial officer, that other expenses were incurred but not reflected on these exhibits, such as mine labor costs and administrative labor costs.

---

[42] That six month (May to October) budget reflects cash requirements of $191,844.29 per month.

MEMORANDUM OF DECISION (LEASE) - 31

The total amount sought by SNS Silver is not easily calculated from the exhibits, as some were adjusted during testimony. However, in briefing, SNS Silver contends the total figure is $842,821.31. Doc. No. 237 at 5.[43] This figure includes $500,000.00 in "lease" payments SNS Silver made to SPMI. The remaining $342,821.31 is addressed in Exhibits 301-327 and in Ho's testimony.[44]

The proof of claim has not been objected to and is not properly before the Court for resolution. *See* §§ 501, 502.[45] Thus the "attorneys' fees" contained within SNS Silver's proof of claim will not be addressed in this Decision. The Court instead considers the evidence presented at the June hearings.

In attempting to clarify the legal basis for the claims and expenses asserted in June, the Court notes that both SNS Silver and the DIP have at times addressed the same as a part of the "monetary defaults" that must be cured by the DIP as a condition of assumption of the Lease. *See* § 365(b)(1), (2). However, this is

---

[43] The Court's tabulation of the line items at 4-5 of SNS Silver's brief yields a total of $849,821.31, not the $842,821.31 asserted in the brief. *See* Doc. No. 237.

[44] On July 7, 2009, SNS Silver filed a proof of claim, assigned Claim No. 99, in the amount of $897,582.81. SNS Silver notes that the proof of claim includes, *inter alia*, attorneys' fees not addressed at hearing. Doc. No. 237 at 5 n.3. The attorneys' fees in the proof of claim are $47,761.81. Subtracting $47,761.50 from $897,582.31 equals $849,821.31, which the Court determined is the correctly totaled figure for the items claimed in the brief. *Supra* note 43.

[45] There is another reason the proof of claim will not be addressed. SNS Silver indicated that this was a "proof of claim seeking an administrative claim," citing § 507(a)(1), (which gives a priority to § 503(b)(1)(A) administrative expenses). The proof of claim was filed notwithstanding the instruction on the claim form itself that states: "NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503." *See generally* § 503(a), (b).

MEMORANDUM OF DECISION (LEASE) - 32

inaccurate.

The Code requires the DIP to compensate or provide adequate assurance to "a party other than the debtor to such . . . lease, for any actual pecuniary loss to such party resulting from such default." SNS Silver is not such a party.

Contrary to the approach taken at hearing, this is not a matter of cure of monetary lease defaults. The Court concludes that, instead, it is a question of allowance of an administrative expense.[46]

Section 503(b)(1)(A) allows an administrative expense for "the actual, necessary costs and expenses of preserving the estate[.]" That grant specifically includes the "wages, salaries, and commissions for services rendered after the commencement of the case[.]" *See* § 503(b)(1)(A)(i).

The authorities relevant to allowance of administrative expenses were addressed in *In re Korn*, 2007 WL 1381807 (D. Idaho Apr. 24, 2007), which affirmed this Court's decision in *In re Korn*, 352 B.R. 228 (Bankr. D. Idaho 2006). The District Court held:

> The party claiming the administrative expense has the burden of proving that the claim is warranted. *In re Coolex, Inc.*, 96.1 I.B.C.R. 35, 36 (Bankr. D. Idaho 1996). Administrative expense claims will be

---

[46] The Court sees no procedural impediment to considering the matter as a contested request for administrative expense. Such requests are not required to be noticed to the creditor body at large. *Cf.* Fed. R. Bankr. P. 2002(a) (matters requiring broader notice). Rather, administrative expenses are litigated between the claimant on the one hand and the trustee or debtor in possession on the other. SNS Silver and the DIP clearly had notice and undertook that litigation here. Other parties in interest requesting notice were provided such notice, and several (including SPMI and Minco Silver) took part in the hearings.

MEMORANDUM OF DECISION (LEASE) - 33

allowed if the debt "(1) arose from a transaction with the debtor-in-possession and (2) directly and substantively benefitted the estate." *In re BCE West, L.P.*, 319 F.3d 1166, 1172 (9th Cir. 2003).

. . .

> To be granted administrative expense priority, the benefits resulting from the expenditures must "inure primarily, if not solely, to the estate as opposed to the benefit of some other entity." *In re Coolex, Inc.*, 96.1 I.B.C.R. at 37.

*Id.* at *3-4. *See also In re Cent. Idaho Forest Prods., Inc.*, 317 B.R. 150, 154, 04.4 I.B.C.R. 159, 160 (Bankr. D. Idaho 2004) ("But the fact that a benefit was conferred on or received by the estate does not alone or automatically justify an allowance of an administrative expense. The request must instead be evaluated and determined under the applicable provisions of the Bankruptcy Code.").

The District Court in *Korn* also noted that a "narrow construction" of § 503(b) is required. *Id.* at 5 (citing *In re Palau Corp.*, 18 F.3d 746, 750 (9th Cir. 1994); *In re Dant & Russell, Inc.*, 853 F.2d 700, 706 (9th Cir. 1988)); *see also Cent. Idaho Forest Prods.*, 317 B.R. at 155.

The DIP has acknowledged from the outset of the case that it intends on compensating SNS Silver for its out-of-pocket expenses in preserving and protecting the Sunshine Mine from the time SNS Silver stepped into possession in February, 2009.[47] *See, e.g.*, § 365 Motion, Doc. No. 43 at 4-5. Certain of SNS

---

[47] Testimony and exhibits offered at hearing on August 4 established that SNS Silver delivered the Sunshine Mine back to SPMI on July 14, 2009. The claims of SNS Silver appear, therefore, subject to February 19 and July 14 bookends. This also illustrates that the expenses

(continued...)

MEMORANDUM OF DECISION (LEASE) - 34

Silver's claimed expenses are uncontested by the DIP.  However, the DIP argues

several are not properly reimbursable or, alternatively, are allowable but are

excessive in amount.

The Court elects, for clarity of presentation, to group the claimed expenses

into several categories.

### 1.    Security; inspection

The DIP does not object to the expense for Ace Lock & Key of $902.11

(Ex. 302), nor to the Acuren inspection expense of $2,703.72 (Ex. 318).  They are

allowed.

SNS Silver made two claims of $500.00 each for Castle & Son Security.

Exs. 301, 319.  In testimony, Ho conceded that the security services provided

related to the Crescent Mine as well as the Sunshine Mine, and that the bills

should be allocated on a 50% - 50% basis.  SNS Silver's post-hearing summary

therefore assert $250.00 under each of the two billings.  The DIP objects,

apparently arguing that the exhibits reference only the Crescent Mine.  The

exhibits do so state, however the testimony is adequate to support the fact that

security patrols reflected by these exhibits were made on both mines.  The

objection is overruled and the adjusted amount of $500.00 (2 x $250.00) is

---

[47] (...continued)
discussed at hearing on June 22-25 were incomplete as they did not, for example, include
expenses from such hearing (or in certain instances, a June 15 pre-hearing ending date) through
July 14.

MEMORANDUM OF DECISION (LEASE) - 35

allowed.

The category total is $4,105.83.

### 2.    Telephone charges

Several telephone bills were introduced.  Two concerned a cellular phone

of SNS Silver chief executive officer, David Greenway.  *See* Ex. 304 (Rogers, for

$3,518.73); Ex. 310 (Rogers, for $1,778.75).[48]  Another bill is in the name

Crescent, Inc.  *See* Ex. 307 (Verizon, for $3,255.99).

Ho testified that Greenway used his cell phone to conduct business

involving the Sunshine Mine as well as general business of SNS Silver not related

to the DIP or the Sunshine Mine.  Ho stated that the "vast majority" of the calls

were to "investors."  He did not indicate any particular allocation of the bills

between (a) the DIP and the Sunshine Mine and (b) other unrelated and

nonreimbursable SNS Silver affairs.  The DIP argues that 25% of the bills

allocated to this case would be acceptable.[49]

The Court concludes that SNS Silver's evidence on the cell phone expense

did not meet the standards of the case law, noted above, requiring affirmative

proof of an expense benefitting the estate.  However, given Ho's testimony that

---

[48]   These two bills are apparently in Canadian dollars, not U.S. dollars.  Other of the
claimed expenses are as well.  Rather than undertaking any conversions in this Decision, the
Court will use the face amount of the bills or invoices, and the parties can make the necessary
conversion calculations where appropriate.

[49]   *See* Doc. No. 239 at 9 ("a 75% reduction is appropriate").

MEMORANDUM OF DECISION (LEASE) - 36

some portion of the calls involved the possession and caretaking of the Sunshine Mine, and the DIP's concession that some benefit was conferred, the Court will allow 25% (*i.e.*, $1,324.37 of the $5,297.48 claimed).

In discussing the Verizon bill, Ho testified under cross-examination that half of the phone service related to the Crescent Mine and half to the Sunshine Mine. The DIP accepts that allocation. The amount of $1,628.00 is allowed.

The category total is $2,952.37.

### 3.    Utilities

Several bills or statements from Avista were introduced. *See* Exs. 305, 306, 315, 323.

Exhibit 305 concerned deposits made to ensure delivery of service to the Sunshine Mine while SNS Silver was in possession. That exhibit indicates a total deposit of $143,969.00 for 12 months. Ho testified, however, that SNS Silver paid Avista only a portion ($48,000.00) of the deposit. Ho also indicated that, except to the extent the deposit is utilized to satisfy utility charges, Avista will return it to SNS Silver. The DIP agrees that, to the extent the deposit is not returned to SNS Silver, the consumed portion of the $48,000.00 paid should be reimbursed.[50] Though the DIP "estimates" this amount at $20,000.00 in its closing brief, *see*

---

[50] The evidence did not support any amount over the $48,000.00 that Ho testified was paid, and the balance of the $143,969.00 shown on the exhibit is therefore ignored. The Court also notes, in passing, that it does not appear that the $48,000 Avista deposit is included in SNS Silver's summary tabulations in its brief.

MEMORANDUM OF DECISION (LEASE) - 37

Doc. 239 at 9, there is no basis in the evidence for the Court to adopt that figure.
Rather, SNS Silver will be allowed an expense for any unreimbursed portion of
the $48,000 deposit it paid.  Such amount may be proven in subsequent
proceedings if the parties are unable to agree on the same.

The other exhibits reflect monthly Avista charges paid by SNS Silver.  *See*,
*e.g.*, Ex. 306 (3/18/09 billing date).  Each bears notation, by highlighting and
tabulation, of the charges in the bill related to the Crescent Mine and those related
to the Sunshine Mine.

The DIP argues that all these bills are acceptable and should be allowed in
the amounts shown as the "Sunshine" charges, except for the charge attributed to
the Sunshine Mine for what the DIP characterizes as the "office building" (1176
Big Creek Road).  *See* Doc. No. 239 at 10 (addressing Ex. 306).[51]  The DIP's
argument appears to be that the 1176 Big Creek Road office building is not part of
the Property as defined under the Lease.

However, the issue with SNS Silver is one of administrative expense, and it
is unlike those issues between the DIP and SPMI regarding Lease defaults that
necessitated focus on whether particular property was within or without the
Leasehold.  The estate here received a benefit from SNS Silver paying utilities on

---

[51]  The DIP's brief errs in suggesting $2,009.56 should be reduced or disallowed on *each*
of the monthly bills.  Doc. 239 at 10-11.  While that is the amount of the charge for the 1176 Big
Creek Road property on Ex. 306, each month's charges are different.  *See* Ex. 315 ($1,662.17 for
this parcel); Ex. 323 ($1,045.01 for this parcel).

MEMORANDUM OF DECISION (LEASE) - 38

the office building, even if that property was outside the Lease. The Court will therefore allow all the portions of the March, April and May monthly bills that are allocated, on their face, to "Sunshine" (*i.e.*, the DIP) as follows: Ex. 306 ($11,443.17); Ex. 315 ($14,832.83); Ex.323 ($15,670.60).[52]

The category totals are (a) up to $48,000.00 depending on reimbursement of deposit, and (b) $41,946.60 for March-May monthly allocated billings.

### 4.    Asset purchase

SNS Silver purchased certain diesel equipment to inspect the Sunshine Mine for $14,100.00. *See* Ex. 311. The evidence was insufficient to establish that this was required for the care and maintenance of the Sunshine Mine (as opposed, for example, to SNS Silver's evaluation of its potential future operations). Moreover, even if the estate received the benefit of an inspection, it did not receive the benefit of the capital asset purchased. SNS Silver did not establish that a benefit was conferred in the full amount of the asset purchase, nor did it prove an amount of any lesser amount as an "inspection" expense that should be allowed against the estate. Therefore, the claim is disallowed.

### 5.    Consulting and engineering

SNS Silver hired Behre Dolbear & Co., Ltd. ("Behre") to prepare a "43-101

---

[52] SNS Silver's summary tabulations in its brief include the total face amount of these Avista bills, and not just the portions that its administrative staff characterized as attributable to Sunshine. To the extent SNS Silver relies on testimony to support inclusion of the entire bills, the Court finds such evidence inadequate to overcome the representation on the face of the submitted exhibits.

MEMORANDUM OF DECISION (LEASE) - 39

report" which was required because SNS Silver's lease of the Sunshine Mine was a "material acquisition" required to be reported by the Toronto Stock Exchange. On March 30, 2009, Behre issued an "advance invoice" for $16,000.00. *See* Ex. 308. On April 30, 2009, Behre issued another invoice for $12,322.68, net of application of the $16,000.00 deposit. *See* Ex. 320. Thus the total amount Behre charged SNS Silver under these exhibits is $28,322.68.[53]

Brian White performed geological services for SNS Silver for $4,225.00. *See* Ex. 309. Ho testified that White assisted Behre.[54]

Ho's testimony established that SRK Consulting Engineers consulted with and assisted SNS Silver in evaluating a possible return of the Sunshine Mine to production. Three invoices were introduced from SRK for $13,949.25, $3,940.13 and $4,830.00. *See* Exs. 313, 321, and 327.

Resource Management Solutions, LLC was also involved in evaluating the potential of returning the Sunshine Mine to production. That company billed SNS Silver on four occasions for: $3,000.00, $2,100.00, $1,800.00 and $2,100.00. *See* Exs. 314, 316, 322, and 326.

Lisa Hardy, a consulting geologist, was also engaged in this endeavor by

---

[53] SNS Silver's summary, *see* Doc. No. 237 at 5, lists two entries for Behre: $12,665.11 and $9,754.25 (totaling $22,419.36). The summary is inconsistent with the documents introduced into evidence.

[54] SNS Silver argues that 50% of White's charges are properly asserted against the DIP. Doc. No. 237 at 5.

MEMORANDUM OF DECISION (LEASE) - 40

SNS Silver.  She billed $4,950.00 and $4,500.00.  *See* Exs. 317, 324.  SNS Silver

suggests 75% of Hardy's work should be allocated to the Sunshine Mine,

apparently in recognition that some work was done on the Crescent Mine as well.

*See* Doc. No. 237 at 5.

The Mining House Inc. billed a total of $24,758.37 to SNS Silver.  Ex. 325.

Because a portion of this invoice expressly relates to the Crescent Mine not the

Sunshine Mine, SNS Silver asserts that only $20,217.59 should be charged to the

DIP.  Doc. No. 237 at 5.

SNS Silver was aware from the inception of the bankruptcy case that the

DIP contended that the Sunshine Mine should be turned over and the Lease could

be assumed.  SNS Silver's final lease with SPMI was executed on April 13, 2009.

Ex. 104.  This was after the DIP served SNS Silver with the complaint in the

adversary proceeding demanding turnover.  *See* Adv. Case No. 09-07014-TLM at

Adv. Doc. No. 12 (SNS Silver's acceptance of service on March 26, 2009).  Thus,

SNS Silver knew that its long-term rights under the April, 2009 lease with SPMI

and its continued possession and control of the Sunshine Mine were at issue.

Under the circumstances, that SNS Silver invested money in evaluating the

potential return of the Sunshine Mine to production was an investment it made for

its own benefit, doing so at a time when its ability to retain the Sunshine Mine

MEMORANDUM OF DECISION (LEASE) - 41

under the April, 2009 lease was subject to dispute.[55]  The geologic and engineering evaluations and consulting had to do with SNS Silver's prospective interests, not with the "care and maintenance" of the Sunshine Mine.  Ho conceded as much on cross-examination.  The estate did not benefit from these expenditures.

For these reasons, none of the identified consulting and engineering services are allowed as administrative expenses under § 503(b)(1)(A).

### 6.    Miscellaneous expenses

Exhibit 312 is an invoice related to an investor relations conference.  It was admittedly not part of any care or maintenance of the Sunshine Mine and is not urged as an allowable expense in SNS Silver's closing brief.  *See* Doc. No. 237. Exhibit 303 is related to acquisition of a compressor at the Crescent Mine, and Ho agreed at hearing this claim would be withdrawn.  Neither is included in the Court's allowed administrative expenses.

SNS Silver's summary and argument includes "travel expenses" of $14,735.18, and "board of director fees" of $7,000.00.  *See* Doc. No. 237 at 5.  No evidence was presented to justify or support these amounts as proper administrative expenses, and they are disallowed.

---

[55]   Ho testified that some of the expenses were incurred in early March, before it was clear that litigation in bankruptcy court might prohibit SNS Silver from continuing with its plans for the Sunshine Mine.  These expenses were in connection with the 43-101 report, which he characterized as required when assets are obtained for "production or exploration."  Even if this timing is arguably more helpful to SNS Silver's claim, the basis for the expense had nothing to do with care and maintenance of the Sunshine Mine nor does it fall within § 503(b)(1)(A) as benefitting the estate.

MEMORANDUM OF DECISION (LEASE) - 42

### 7.    Mine labor

SNS Silver asserts that $98,225.19 is owed for labor costs at the Sunshine Mine.  *See* Doc. No. 237 at 5.  This figure is based on 100% of the labor hired to work at the Sunshine Mine, and an allocated 50% of the labor force at the Crescent Mine that was reassigned to assist with the Sunshine Mine.

Ho testified regarding the number of hours the laborers generally worked and the hourly rates of pay.  He noted that they worked in areas of security, maintenance, safety, mechanical and electrical, or as hoistmen.  Ho ascribed the $98,225.19 figure to the period of March 1 to June 15, 2009.  There were no corroborating or explanatory exhibits.

The DIP notes this lack of detail.  However, it does not dispute that SNS Silver provided necessary labor for the care and maintenance of the Sunshine Mine.  The DIP argues that by rounding, extrapolating and averaging various figures, an amount of $93,110.25 would be sufficiently accurate and acceptable to the DIP as a reimbursable mine labor expense.  Doc. 239 at 12.[56]  Under the circumstances, the DIP's suggested critique and adjustment of SNS Silver's figure is not given great weight.  More to th point, even though there were issues with the clarity of SNS Silver's own evidence, the DIP concedes a number within about

---

[56]   The DIP's approach relies in part on testimony of Higdem and Rux, and an "estimate" of SNS Silver's care and maintenance expenses, Ex. 106, that Ho called extremely conservative and even Rux agreed understated certain items.

MEMORANDUM OF DECISION (LEASE) - 43

$5,000.00 of SNS Silver's claim is acceptable.

The Court will allow the $98,225.19 asserted by SNS Silver for mine labor for the period through June 15.

### 8.    Administrative labor

SNS Silver argues that 50% of its corporate office payroll should be allocated to the Sunshine Mine, in the amount of $70,395.11.  Doc. No. 237 at 5.[57] The testimony about how the labors of SNS Silver's Vancouver office related to the Sunshine Mine was even less detailed and precise than the generalized testimony regarding the mine labor.  That the several administrative employees (including CFO Ho and CEO Greenway) devoted 50% of their working time to the Sunshine Mine was not substantiated by appreciable detail or explanation. Additionally, SNS Silver did not produce evidence that these efforts "regarding" the Sunshine Mine were in connection with its care and maintenance rather than in considering the future development and use of the Sunshine Mine under SNS Silver's April, 2009 lease with SPMI.

Though the DIP has suggested an approach that would allow some amount in this category, the evidentiary deficiency is simply too great to be approached in this fashion.  The Court concludes that the requisite burden has not been met by SNS Silver to support an administrative labor component to the asserted

---

[57]  Ho had testified that $51,063.54 was such an allocated 50%, though the periods of time in the testimony and brief may not be consistent.

MEMORANDUM OF DECISION (LEASE) - 44

§ 503(b)(1)(A) administrative expense.

### 9.    Lease payments

SNS Silver includes $500,000.00 in its claimed expenses, representing the payments it made to SPMI under the April, 2009 lease.[58]  These were not expenses incurred for the benefit of the estate, and the standards for allowance of the same as an administrative expense have not been met.  They will not be allowed.

The totals on the § 503(b)(1)(A) request are summarized below.

**CONCLUSION**

On the issues of the monetary defaults and or pecuniary losses suffered that must be cured or satisfied by the DIP as a condition of assumption of the Lease under § 365(b), the Court finds the following amounts established by the evidence:

| | | |
|---|---|---|
| Rent | $60,000.00 | |
| Taxes | $70,000.00 | |
| Lien (Atlas Faucett) | $130,572.47 | (plus additional interest) |
| Lien (Miller Sales) | $150,966.68 | (plus additional interest) |
| EPA (Big Creek spill) | $50,000.00 | |
| EPA/Tribe consent decree | $382,020.95 | |
| Utility deposit | $140,960.00 | |
| Utilities owed | $177,900.00 | (less non-Lease parcels) |

---

[58]  The April lease between SNS Silver and SPMI, Ex. 104, called for payments significantly in excess of the amounts required in Sterling's Lease, Ex. 100.  *See* Ex. 104 at 8-9.

MEMORANDUM OF DECISION (LEASE) - 45

Environmental remediation                    $21,500.00

On the request of SNS Silver for allowance of an administrative expense

under § 503(b)(1)(A), the Court allows the following:

Security/inspections                $4,105.83
Telephone                           $2,952.37
Utility deposit                     $48,000.00     (less reimbursements)
Utility charges                     $41,946.60
Mine labor                          $98,225.19

An Order will be entered consistent with this Decision.

DATED:  August 21, 2009

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION (LEASE) - 46