Ford Elsaesser, ISB#2205
Bruce A. Anderson, ISB #3392
ELSAESSER JARZABEK ANDERSON
MARKS ELLIOTT & MACDONALD, CHTD.
Attorneys at Law
1400 Northwood Center Court
Coeur d'Alene, ID 83814
Tel:    (208) 667-2900
Fax:    (208) 667-2150

Attorney for Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In Re: | Case No. 09-20178-TLM |
| STERLING MINING COMPANY, | SECOND SUPPLEMENTAL MOTION FOR APPROVAL OF POST-PETITION FINANCING |
| Debtor-in-Possession | |

COMES NOW Debtor-in-Possession, Sterling Mining Company ("Debtor"), by and through its undersigned counsel Bruce A. Anderson of Elsaesser Jarzabek Anderson Marks Elliott & Macdonald, Chtd., and moves this Court to authorize additional supplemental post-petition borrowing under the terms set forth herein. This Motion is based upon 11 U.S.C. § 364, F.R.B.P. 4001(c), L.B.R. 4001.1(b). In support of this Motion Debtor states the following:

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1408. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D).

SECOND SUPPLEMENTAL
MOTION FOR APPROVAL OF
POST-PETITION FINANCING                    -1-

## BACKGROUND

2.      The Debtor is an Idaho Corporation, and has its principal place of business in the State of Idaho.  The Debtor engages in the business of hard rock mining, located in Shoshone County.

3.      On or about June 6, 2003, Debtor and Sunshine Precious Metals, Inc., ("Sunshine") entered into a Mining Lease and Agreement ("Lease"), wherein Sunshine, as Lessor, and Debtor, as Lessee, would lease certain property which included all mineral rights, title and interest of Sunshine, including lease rights in the asset commonly known as Sunshine Mine and Mill, including equipment and all mineral and ore in place in that portion of Sunshine's property, ("Leasehold").

4.      Pursuant to the Lease Debtor acquired, *inter alia,* an option to purchase the Leasehold for $3 to $5 million dollars.  Debtor's property in and rights granted by the Lease, represents significant value and are property of the estate of this Debtor pursuant to 11 U.S.C. § 541(a).

5.      In late 2008, Debtor's operations dwindled and funds necessary to maintain security and avoid deterioration of valuable Leasehold assets were not available.  On February 24, 2009, physical possession of the Leasehold was turned over to Sunshine.

6.      On March 13, 2009, Debtor filed a complaint at Adversary Proceeding No. 09-07014, for turnover of the Leasehold to the Debtor pursuant to F.R.B.P. 7001(1).

7.      On April 1, 2009, Debtor filed a Motion for Sterling to Assume Sunshine Lease Pursuant to 11 U.S.C. § 365(a) and to Cure Defaults.

SECOND SUPPLEMENTAL
MOTION FOR APPROVAL OF
POST-PETITION FINANCING                    -2-

8.    On April 20, 2009, Debtor filed its Motion for Approval of Post-Petition Financing Agreement, which sought emergency interim financing, which was approved. Debtor later filed a Final Motion for Approval of Post-Petition Financing Agreement, which was approved by this Court on August 14, 2009.

9.    The Court ordered the turnover of the Sunshine Mine Leasehold on August 14, 2009. On Wednesday afternoon August 19, 2009, Debtor's employees regained physical possession of the Sunshine Mine.

10.    On August 21, 2009, the Court determined default cure amounts and administrative expenses due to assume the Lease. The amount due Sunshine, SNS Silver Corp., ("SNS") and for other items was roughly $1.4 million. Debtor has paid most, but not all, of these amounts.

11.    Minco's initial pledge of financing was for $1.0 million, and an additional $2.0 million was approved by this Court. While the full amount of the $3.0 million total financing has net yet been drawn out, it will be drawn out before the end of February 2010. It is anticipated that all default amounts will be paid.

12.    Sterling requires additional financing in the amount of $1.25 million and $750,000.00, to pay the EPA/Tribe penalty of $1.25 million and for an additional three months of operating and administrative expenses. Confirmation of the Plan of Reorganization in this matter has been delayed due to litigation regarding the EPA/Tribe penalty. The EPA/Tribe penalty matter has tentatively been settled, and Sterling seeks to move forward and secure financing to pay such settled amount, once finally approved, and to continue its operations beyond the originally estimated confirmation date of February 2, 2010, until as late as June 6,

SECOND SUPPLEMENTAL
MOTION FOR APPROVAL OF
POST-PETITION FINANCING                    -3-

2010. Sterling has tentatively scheduled confirmation for April 6, 2010, and it is hoped that all requested DIP financing will not be necessary.

    12.    As can be seen from the budget attached as **Exhibit A**, an additional $2 million dollars will be needed by Debtor to pay the EPA/Tribe penalty, and to continue operations on a go forward basis for the next three months.

    13.    Minco is a secured creditor of this estate. Minco's pre-petition claims of approximately $6 million dollars, based on the July 21, 2008, credit facility, plus the $3.0 million post-petition lending made and accruals. Minco may claim an unsecured claim for a breakup fee in the amount of $2.7 million dollars. Nothing set forth in this Motion, or in the Post Petition Secured Financing Agreement constitutes a waiver of Debtor's right to object to such claim.

    14.    Debtor is unable to obtain unsecured credit allowable under 11 U.S.C. § 503(b)(1), allowable as an administrative expense claim. The proposed secured financing is therefore needed in order that Debtor may continue to pay administrative expenses and preserve the value of the Leasehold and other estate property for creditors of the estate. Debtor has negotiated at arms length and in good faith through counsel, and counsel for Minco, the terms of the proposed financing. Debtor believes that the terms of the proposed Second Supplemental Post Petition Secured Financing Agreement, attached hereto as **Exhibit B**, are fair and reasonable and are in the best interests of Debtor's estate and its creditors. The Debtor seeks approval of the financing in order to minimize disruption to its reorganization efforts, and thereby avoid immediate and irreparable harm to its assets. Documents will be executed upon approval of the Court

SECOND SUPPLEMENTAL
MOTION FOR APPROVAL OF
POST-PETITION FINANCING      -4-

## SUMMARY OF THE FINANCING AGREEMENT

15.     Debtor's schedules indicate assets consisting of real property in the amount of $8,472,625.00, and personal property in the amount of $3,234,136.94, for total assets of $11,706,761.94.    Against those assets Debtor now lists secured claims of $6,633,034.61, thus $5,073,727.33 of unencumbered assets exist upon which Minco's credit facility can be secured. Debtor has offers of $11,750,000.00 and $12,500,000.00 to purchase Debtor's Stock.

16.     The lender is Minco Silver Corporation whose address is 1055 Georgia Street, Suite 2272, Vancouver, British Columbia, V6E 3P3, CANADA.  Minco is a secured creditor of Debtor with a scheduled second position pre-petition blanket security interest on all assets of Debtor, excepting the Sunshine Lease, securing an amount scheduled at $5,211,834.61 as of the petition date.

17.     The funding set forth herein shall be made in monthly increments up to a maximum of $750,000.00 and the $1.25 million settlement amount once approved.  Such request for funds will be made pursuant to the attached budget, but only for expenses reasonable and necessary to maintain the mining properties and to pay reasonable and necessary administrative and care and maintenance expenses. Minco will accrue monthly interest payments.   The agreement provides that funding will terminate unless final and binding orders of this Court are entered no later than June 6, 2010.

18.     The entities with general lien claims against assets of the Debtor and their priority positions are as follows:

    a)    Shoshone County Treasurer in the amount of $9,877.68 (real property lien) (will be paid off with prior financing);

SECOND SUPPLEMENTAL
MOTION FOR APPROVAL OF
POST-PETITION FINANCING              -5-

b)      Private Capital Group in the amount of $1,421,200.00 (blanket lien
        excludes Sunshine Lease);

c)      Minco Silver Corporation in the amount of $5,211,834.61 (blanket lien
        excludes Sunshine Lease and post-petition financing).

19.     Debtor has scheduled accounts receivable in the amount of $20,000.00.  Attached

hereto as **Exhibit C** is the Accounts Receivable Aging Schedule.   As of this date, Debtor

estimates that all accounts receivable are uncollectible.

20.     With the exception of PCG and taxing authorities, no other entities have claims to

the collateral proposed to secure the post-petition financing.

21.     The proposed agreement contains provisions which may be construed to divest

the Debtor or other parties in interest of discretion in the formulation of a plan or administration

of the estate.  More specifically, the agreement at paragraph 3.1 conditions the agreement on the

ability to appoint two representatives of Minco Silver to Debtor's Board of Directors.  As of this

date there are three members of the Sterling Board of Directors, and one director from Minco, for

a total of four directors.  It is not intended that Minco representatives obtain a controlling voting

position on the Board of Directors of Debtor.  Parties in interest are requested to review such

provisions closely as the same may affect their rights.

22.     This Motion is proposed in good faith and it is believed that it is in the best

interests of the creditors and other parties in interest.  The feasibility of Debtor to fully monetize

its assets, more particularly the Sunshine Lease, rests on its ability to obtain financing in order to

pay bankruptcy administrative expenses, maintain care and maintenance expenses, and confirm

the Plan.

SECOND SUPPLEMENTAL
MOTION FOR APPROVAL OF
POST-PETITION FINANCING            -6-

WHEREFORE the Debtor requests the Court enter an order:

1.    Granting this Second Supplemental Motion for Approval of Post-Petition Financing and authorizing Debtor to enter into the borrowing arrangement with Minco for an additional $2.0 million; and

2.    Granting such and other further relief as the Court may deem appropriate.

Respectfully submitted this _12_ day of February, 2010.

> ELSAESSER JARZABEK ANDERSON
> MARKS ELLIOTT & MACDONALD,
> CHTD.
>
> Bruce A. Anderson
> Attorney for Sterling Mining Company

SECOND SUPPLEMENTAL
MOTION FOR APPROVAL OF
POST-PETITION FINANCING                    -7-

**SIX-MONTH POST-PETITION CASH PROJECTIONS**

Case No.    09-20178

Debtor    Sterling Mining Company

|  | February | March | April | May |
|---|---|---|---|---|
| **Beg. Cash Balance:** | 52,689 | 178,647 | 36,056 | 37,838 |
| **Cash Receipts** | | | | |
| Cash Sales | | | | |
| Lease Income | 450 | 450 | 450 | 450 |
| Sale of Assets | | | | |
| Post-Petition Borrowing - this request | 546,956 | | | |
| Other: Allegro Escrow | 80,000 | | | |
| Other: 1/19 Funding Request | 300,000 | | | |
| Post Petition Borrowing | | | | |
| Additional DIP Shortfall | | 1,500,000 | 250,000 | 250,000 |
| **Total Cash Receipts** | 927,406 | 1,500,450 | 250,450 | 250,450 |
| **Cash Disbursements** | | | | |
| Outstanding PO's as of 2/1/10 | 11,210 | - | - | - |
| Auto/Truck Expense | 1,000 | 1,000 | 1,000 | 1,000 |
| Employee Benefits | 15,500 | 15,500 | 15,500 | 15,500 |
| Insurance | 11,500 | 11,500 | 11,500 | 11,500 |
| D&O Insurance | | | | |
| Inventory Purchases | | | | |
| Officers Salaries | 2,500 | 2,500 | 2,500 | 2,500 |
| Other Salaries/Wages | 52,762 | 63,896 | 61,118 | 55,562 |
| Payroll Taxes | 9,133 | 10,815 | 10,345 | 9,405 |
| Rent/Lease Payments - CdA | 1,955 | 1,955 | 1,955 | 1,955 |
| Repairs/Maint. | 7,500 | 7,500 | 7,500 | 7,500 |
| Tailings Pond Treatment | 5,000 | 5,000 | 5,000 | 5,000 |
| NPDES Testing | 4,000 | - | 4,000 | 4,000 |
| Secured Debt Payments | | | | |
| Mine Claim Fees BLM | | | | |
| Supplies | 500 | 500 | 500 | 500 |
| Central Mine Rescue | 1,000 | 1,000 | 1,000 | 1,000 |
| Utilities (power, phone, net, etc.) | 47,500 | 47,500 | 47,500 | 47,500 |
| Professional Fees (CC, adnet, R&T, vw) | 1,750 | 1,500 | 1,500 | 1,500 |
| USTrustee Quarterly Fees | - | | 4,875 | |
| Safety Consult (RM) | 1,800 | 1,800 | 1,800 | 1,800 |
| Acct Services (JM, LM) | 11,600 | 8,600 | 8,600 | 3,200 |
| Sunshine Mine Lease - SPMI | 10,000 | 10,000 | 10,000 | 10,000 |
| Chester Lease | 600 | 600 | 600 | 600 |
| Metropolitan Lease | 1,000 | 1,000 | 1,000 | 1,000 |
| Mineral Mountain Lease | 3,600 | - | - | - |
| Merger Lease | | | | |
| Rock Creek Lease | 500 | 500 | 500 | 500 |
| Western Continental | | | | |
| Other: Property Taxes | - | - | - | - |
| Other: Office Equip Rent | 375 | 375 | 375 | 375 |
| **Defaults / Legal** | | | | |
| Chester Lease | 6,600 | | | |
| Metropolitan Lease | 6,000 | | | |
| Mineral Mountain Lease | 3,600 | | | |
| Rock Creek Lease | 3,000 | | | |
| Default Cure - Shoshone Co. Taxes | 96,227 | - | - | - |
| Default Cure - SNS | 195,836 | - | - | - |
| Default Cure - Avista Pre-Petition | 177,900 | - | - | - |
| Default Cure - SPMI Lease 3/09 - 1/10 | 110,000 | - | - | - |
| EPA/Tribe - Legal Settlement | | 1,250,000 | | |
| Attorneys 11/01 to 2/28 | | 200,000 | 50,000 | 50,000 |
| **Total Cash Disbursement** | 801,448 | 1,643,041 | 248,668 | 231,897 |
| **Net Cash Flow** | 125,958 | (142,591) | 1,782 | 18,553 |
| **Ending Cash Balance** | 178,647 | 36,056 | 37,838 | 56,391 |



Exhibit A

## SECOND SUPPLEMENTAL POST PETITION SECURED FINANCING AGREEMENT

**THIS AGREEMENT** made as of _____day of _____, 2010 (the "Effective Date").

BETWEEN:

> **MINCO SILVER CORPORATION,** a Corporation incorporated under the law of British Columbia having an address at Suite 2772 - 1055 Georgia Street Vancouver, British Columbia, V6E 3P3.
>
> ("Minco Silver")

AND:

> **STERLING MINING COMPANY,** a Corporation incorporated under the law of Idaho, United States and having an address at 2201 Government Way, Suite E, Coeur d'Alene, Idaho  83814
>
> ("Sterling")

WHEREAS:

A. Sterling has filed a voluntary petition under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Idaho.

B. On July 30, 2008 prior to filing the chapter 11 petition Minco Silver advanced a loan in the amount of five million dollars ($5,000,000) to the account of Sterling pursuant the terms of a Credit Facility Agreement between Minco Silver and Sterling dated July 21, 2008.

C. To evidence this loan Sterling issued to the favor of Minco Silver a secured promissory note whereby Sterling promised to pay the principal sum of five million dollars ($5,000,000) by December 15, 2008.

D. To secure this loan Sterling issued in favor of Minco Silver:

(a) a secured interest in all present and future right, title, and interest in all of Sterling's assets held prior to filing the Petition including all leasehold rights (except the Sunshine Lease), rights of way, easements; government leases; products and proceeds thereof;

(b) a lien, mortgage and a perfected secured interest in all of Sterling's real property held prior to filing the chapter 11 petition or hereafter owned; and

E. Prior to the Execution of this Agreement, Minco Silver beginning in February 2009 advanced sufficient funds to continue paying on behalf of Sterling, Sterling's Prepetition Carrying Costs (as defined below).

**Exhibit** B

1

F.  Minco Silver has agreed to continue to finance Sterling for the limited purpose as set out in Section 2.3 below while Sterling seeks to reorganize in Chapter 11 by extending to Sterling this Agreement which has been approved in principle by the US Bankruptcy Court by its Final Order Approving Post-Petition Financing Agreement, entered August 28, 2009 (Docket # 341), and its Order on Supplemental Motion for Approval of Post-Petition Financing and Objection Thereto, entered October 14, 2009 (Docket #411).

G.  Sterling, to continue its reorganization efforts in Chapter 11, requires additional funding to cure the Sunshine Lease by paying the EPA/Tribe settlement amount and to meet Sterling's ongoing financial needs.  Minco Silver is willing to continue to provide such additional financing on the terms and conditions set forth in this agreement.

**NOW THEREFORE THIS AGREEMENT WITNESSES** that in consideration of the agreements and payments provided herein, the parties agree as follows:

## 1.  INTERPRETATION

1.1  **Defined Terms** – The following defined terms shall for all purposes of this Agreement, or amendment, substitute, supplement, replacement or addition hereto, have the following respective meanings unless the context otherwise specifies or requires or unless otherwise defined herein:

**"Agreement"** means this Supplemental Post Petition Secured Financing Agreement;

**"Advance"** means any payment to the account of Sterling from the proceeds under this Loan Facility;

**"Assignment"** means that certain Assignment and Assumption Agreement dated July 21, 2008 between Minco Silver and Sterling assigning to Minco Silver all right, title and interest in the Sunshine Mine under the Sunshine Lease;

**"Assumption Action"** means Sterling's motion filed on March 25, 2009 in the US Bankruptcy Court under case #09-20178-TLM to assume and to cure any and all defaults under the Sunshine Lease.

**"Bankruptcy"** means the filing of the Petition for creditor protection and reorganization under chapter 11 of the Bankruptcy Code;

**"Bankruptcy Code" or "Code"** means the Bankruptcy Code of the United States of America;

2

**"Business Day"** means a day which is not a Saturday, Sunday or a statutory holiday in the Province of British Columbia or in the State of Idaho;

**"Care & Maintenance" or "Care & Maintenance Program"** means the care & maintenance program established and agreed to by Sterling and Minco Silver for the duration of the Bankruptcy to maintain the value of the Sunshine Mine in a ready condition to return to production including any operational and administrative costs;

**"Collateral"** means all of Sterling's prepetition and post petition real and personal property whether now existing or hereinafter acquired, including without limitation all accounts, contracts rights general intangibles, inventory, equipment, fixtures, mineral rights including the Sunshine Lease and all other leasehold interests, and real property and interests therein of Sterling, and all proceeds thereof;

**"Cure Payment" or "Cure Payments"** means the payment of proceeds under this Loan Facility to the account of Sterling to cover the costs of curing the Defaults as determined by the Court at the outcome of the Assumption Action pursuant to Section 3.1(c) below;

**"Default" or "Defaults"** means certain alleged defaults under the Sunshine Lease which have now been determined by decision of the Bankruptcy court;

**"Escrow" or "Escrow Account"** means escrow account #59994388486 as set out in the Escrow Agreement dated March 27, 2009 between Minco Silver and Allegro Services, Inc. in favor of Sterling attached as Schedule "A" to this Agreement;

**"Event of Default"** means any one of the events set forth in Section 5.1 below;

**"Loan Facility"** means this loan facility established by Minco Silver in favor Sterling pursuant to Section 2.1 below;

**"Loan Facility Reduction Account" or "DIP Account"** means the account established by Sterling pursuant to Section 2.3(a) below;

**"Insurance" or "Insurance Payment"** means the monthly installment in the amount of $15,719.19 to the account of Westchester Surplus Lines, Sterling's mining insurance carrier pursuant to the terms of Sterling's all risk mining insurance policy on or before the 6th day of each month;

**"Lease Payment"** means the monthly installment in the amount of $10,000 to the account of Sterling in favor of SPMI pursuant to the terms of the Sunshine Lease on or before the 6th day of each month;

3

**"Outstanding Balance"** means the principal amounts of each Advance, together with all accrued but unpaid interest hereunder from time to time;

**"Petition"** means Sterling's voluntary petition in chapter 11 bankruptcy filed in the US Bankruptcy Court on March 3, 2009;

**"Prepetition Carrying Costs"** means the total amount in Lease Payments and Insurance Payments paid by Minco Silver on behalf of Sterling prior to the Court's approval of this Agreement;

**"Prepetition Loan"** means that certain loan in the amount of $5,000,000 advanced to Sterling on July 30, 2008 plus interest and expenses pursuant to the terms of the Prepetition Loan Agreement;

**"Prepetition Loan Agreement"** means the Credit Facility Agreement entered into on July 21, 2008 between Minco Silver and Sterling in which Minco Silver agreed to lend to Sterling funds from time to time to a maximum amount of $15,000,000;

**"Request for Funds Notice"** means the request for funds notice and certification in form attached as Schedule "B" to this Agreement;

**"Security"** has the meaning ascribed in Section 2.7 below;

**"Secured Promissory Note"** means the secured promissory note attached as Schedule "C" to this Agreement;

**"SPMI"** means Sunshine Precious Metals, Inc., a mining company incorporated under the laws of the State of Delaware with principle offices in the State of Idaho;

**"SNS"** means SNS Silver Corp a Canadian junior resource exploration company incorporated under the law of British Columbia and having an address at Suite 1207 – 409 Granville Street Vancouver, British Columbia, V6C 1T2;

**"Subsidiary or Subsidiaries"** means, with respect to Sterling, of which at least a majority of the outstanding shares to which there is attached voting power under ordinary circumstances to elect a majority of the board of directors of such corporation, shall at the relevant time be owned directly or indirectly by Sterling, one or more subsidiaries;

**"Sunshine Lease"** means that certain lease and amendments hereto entered into between Sterling and SPMI on June 6, 2003;

**"Sunshine Mine"** means the underground Sunshine mine located near Wallace Idaho including the silver summit mine and all present and after-acquired

4

personal property derived from or used or acquired for use in connection therewith as set out in the Sunshine Lease;

**"US Bankruptcy Court" or "Court"** means the United States Bankruptcy Court for the District of Idaho;

### 1.2    Currency

Unless otherwise specified herein, all statements of or references to dollar amounts in this Agreement shall mean lawful money of the United States of America. Where there is a reference in this Agreement to any amount.

### 1.3    Plural and Singular.

Where the context so requires, words importing the singular number shall include the plural and vice versa.

### 1.4    Headings.

The division of this Agreement into Sections and Subsections and the insertion of headings in this Agreement are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

## 2.    LOAN FACILITY

### 2.1    Establishment of Loan Facility

Minco Silver hereby agrees to lend to Sterling, from time to time, for the duration of the Bankruptcy in accordance with this Agreement, proceeds under this Loan Facility subject to the conditions set out in Section 3.1 below. So long as Sterling is not in default under the terms of this Agreement or any other agreements between the parties, such funding will be available for Sterling's use as set out in Section 2.3 to a maximum amount outstanding from time to time of two million dollars ($2,000,000). This funding is in addition to the three million dollars ($3,000,000) of post petition debtor in possession financing previously approved by the Bankruptcy Court.

### 2.2    Loan Reduction Debtor in Possession Account

(a) Sterling shall continue to make all deposits and disbursements using the established Debtor in Possession (DIP) Account as required by the United States Trustee's Chapter 11 Operating Guidelines of which Sterling shall deposit, if any, proceeds payable to Sterling of which are now due or become due in the future including any proceeds from the sale of any Collateral (the "Receivables") so long as this Agreement is in effect;

5

(b) Sterling shall deposit all Receivables into the DIP Account subject to Section 2.2(c) below. It is understood by the Parties that all amounts collected when received shall be applied to the repayment of the Outstanding Balance; and

(c) Sterling acknowledges that on the date of the Petition any funds in any account in the name of Sterling or held for the benefit of Sterling (the "Cash Accounts") forms part of the Collateral in favor of Minco Silver. Minco Silver shall apply the amount of the monthly Interest incurred on the Outstanding Balance owing on this Loan Facility out of the Cash Accounts. The Cash Accounts shall remain as Collateral of Minco Silver, subject to withdraw by Sterling upon Minco Silver's approval thereof and only for the purposes and in the amount set forth in the approved budget. To the extent that Minco Silver receives payments, if any, from Cash Accounts in excess the costs of the monthly Interest charges Minco Silver shall receive payments to be used to repay the Prepetition Carrying Costs.

## 2.3    Use of Funds

Sterling agrees with Minco Silver that the proceeds under this Loan Facility shall be used by Sterling to pay:

(a) the costs and expenses associated with curing the Defaults of Sterling under the Sunshine Lease as determined by the Bankruptcy Court. More particularly, the settlement to the EPA/Tribe of $1.25 million.

(b) the costs and expenses associated with the Care and Maintenance Program subject to Section 3.1(c) below; and

(c) Ordinary and reasonable costs of administration of Sterling during the term of this agreement as set forth in an operating budget attached as Schedule "D" to this Agreement, subject to the approval of Minco Silver. Sterling may exceed line items by up to 5% so long as the overall budget is not exceeded.

The proceeds under the Loan Facility may be used by Sterling as set in this Section 2.3 and for no other purpose whatsoever without the express written consent of Minco Silver.

## 2.4    Request for Funds.

Prior to making available to Sterling any Advance Minco Silver shall, make such an advance provided Sterling submits to Minco Silver in writing:

(a) a Request for Funds Notice signed by the President of Sterling, a Director or its Counsel; and

6

(b) a Secured Promissory Note signed by the President or a Director of Sterling, and dated the day of the Advance.

**2.5    Rate of Interest**

Interest shall accrue on the Outstanding Balance from the date of each Advance at the rate of ten percent (10%) per annum payable by Sterling to Minco Silver monthly on the last Business Day of every month, as well as after maturity, default and judgment (the "Interest").

**2.6    Security**

As security for this Loan Facility in order to secure all obligations, liabilities, or indebtedness of Sterling to Minco Silver pursuant to this Agreement; the Post Petition Loan and Prepetition Carrying Costs incurred post Petition subject to Section 3.1(b) below, Sterling shall grant, execute and deliver, or cause to be executed and delivered to Minco Silver:

(a) a lien and mortgage upon and a priority security interest in the Collateral whether now existing or hereafter acquired, including without limitation all accounts, contracts, rights, general intangibles, inventory, equipment, fixtures, mineral rights, all lease hold interests, including the Sunshine Lease, and real property and interests therein of, and all proceeds thereof, which liens and security interests are subject to any existing valid perfected and enforceable security interest or lien;

(b) any other security as Minco Silver may reasonably require;

(the "Security") in all forms and terms satisfactory to Minco Silver and its Counsel.

Said Security shall be junior in priority to prior existing perfected security interests in assets of Sterling existing as of the date of the filing of the Petition.

## 3.  CONDITIONS PRECEDENT

**3.1    Conditions to this Agreement**

It is a condition precedent to this Agreement that each of the following conditions have been satisfied in form and terms satisfactory to Minco Silver and its counsel:

(a) there shall be in affect a binding order of the US Bankruptcy Court authorizing Minco Silver and Sterling to enter into this Agreement;

(b) there shall be in effect a binding order of the US Bankruptcy Court authorizing Sterling to enter into and perfect its obligations hereunder and providing for such liens, administrative priorities, and adequate protection

7

to Minco Silver as Minco Silver shall require, such Court Order to be in form and substance satisfactory to Minco Silver;

(c)  Minco Silver and Sterling shall have reached substantial agreement as to the costs of the Care and Maintenance Program for the duration of the Bankruptcy, and with respect to the reporting requirements on a weekly basis to determine compliance with said budget;

(d)  At the option of Minco the appointment of up to two representatives of Minco Silver to Sterling's Board of Directors, but in no case will Minco representatives make up a majority of Sterling's Board of Directors;

(e)  no Default has occurred and is continuing or would arise immediately after giving effect to or as a result of any Advance;

(f)  there shall have been no adverse material change in the assets of Sterling or its' Subsidiaries, taken as a whole, since the date the Petition was filed; and

(g)  the Outstanding Balance of each Advances of Minco Silver would not exceed the amount of the Loan Facility;

If any of the foregoing conditions precedent are not satisfied or waived by Minco Silver this Agreement will terminate, and Minco Silver shall be under no further obligation to Sterling in connection with the transaction contemplated herein

**3.2    Conditions to each Advance**

Sterling shall be deemed to represent and warrant to Minco Silver at the time of each Advance hereunder that the conditions set forth in Section 3.1 have been complied with and there has been no change to the orders of the Court referred to in section 5(a) and 5(b) which has not been approved by Minco Silver.

## 4.  COVENANTS

**4.1**    Sterling covenants and agrees that so long as an Outstanding Balance remains under this Agreement, Sterling shall:

(a)  submit to Minco Silver such reports, financial, and other documents as Minco Silver may reasonably require;

(b)  take all reasonable steps to preserve and protect the Collateral and Minco Silver's security interests and mortgages upon its properties, and  Sterling shall keep in full force and effect all insurance policies with respect to the Collateral, and if any of such properties constituting the Collateral shall be in danger of being damages, forfeited, or lost due to Sterling's inability to

8

comply with contracts or leases, or otherwise, Sterling shall notify Minco promptly so as to permit it to take steps to protect and preserve its Collateral;

(c) affirm and ratify each of the mortgages and security agreements given to secure the indebtedness under the Prepetition Loan Agreement and other prepetition obligations of Sterling to Minco Silver, provided however that this clause shall not be construed to constitute a waiver of any claim of Sterling against Minco arising out of prepetition transactions;

(d) deliver promptly to Minco Silver and its counsel copies of each pleading or report heretofore of hereafter filed with the Court in connection with bankruptcy proceedings of Sterling concurrently with the filing thereof, including but not limited to all adversary proceedings, applications, or motions to such Court;

(e) record and file (i) certified copies of its petition for reorganization under chapter 11 of the Bankruptcy Code file in the US Bankruptcy Court, and (ii) a certified copy of all orders of the Court affecting real property of Sterling in the appropriate office(s) in each jurisdiction where any real property owned by Sterling is situated;

(f) not apply to the US Bankruptcy Court for an Order authorizing the use of monies that form part of the Collateral without prior written notice to Minco Silver on the application of any such Collateral;

(g) execute and enter into any document as shall be required or contemplated herein and perform all obligations hereunder and other instruments or documents reasonably requested  from time to time from Minco Silver to evidence and secure the  repayment of the Prepetition Loan and the Loan Facility hereunder, and any and all other indebtedness or obligations of Sterling to Minco Silver created by, or arising under, any of the terms and conditions of this Agreement or otherwise to carry out, effectuate, or consummate the terms and this Agreement;

(h) at all times maintain its corporate existence and the corporate existence of the Subsidiaries;

(i) duly perform the obligations under this Agreement and all other agreements and instruments executed and delivered hereunder or thereunder;

(j) at all times comply with all applicable laws, except where such voluntary non-compliance could not reasonably be expected to have a material adverse effect on the business, properties or assets of Sterling or any Subsidiary;

(k) furnish and give to Minco Silver (if such is the case) notice that an Event of Default has occurred and, if applicable, is continuing or notice in respect of any Default and specifying the nature of same; and

(l) perform and do all such acts and things as are necessary to perfect and maintain the security interest granted to Minco Silver pursuant to the Security.

## 5.  EVENTS OF DEFAULTS

5.1    Each and every of the events set forth in this section shall be an event of default ("**Event of Default**"):

(a) Sterling shall cease to be operated pursuant to chapter 11 of the Bankruptcy Code, an order shall be entered pursuant to section 1104 of the Code appointing a trustee for Sterling, or an order shall be entered directing liquidation of Sterling pursuant to chapter 7 of the Code;

(b) Sterling shall have failed to have obtained by June 30, 2009 a binding order of the US Bankruptcy Court authorizing Sterling to Cure and Assume the Sunshine Lease (waived per testimony June 25, 2009);

(c) Sterling shall have failed to have obtained by June 30, 2009 a binding order of the US Bankruptcy Court ordering the turnover to Sterling of the Sunshine Mine from SPMI and SNS (waived per testimony June 25, 2009);

(d) any of the orders referred to in subsections (b) and (c) hereof shall be reversed or modified in any material respect or any future or future order of the Court shall adversely affect Minco Silver's Collateral, its rights under this Agreement, under the Prepetition Loan Agreement, or otherwise;

(e) failure to pay within fourteen (14) days after the due date Sterling was obligated to pay to Minco Silver the Interest as set out in Section 2.2(c) of this Agreement;

(f) Sterling shall breach any representation or warranty or shall fail to meet any condition or perform any agreement or covenant contained in this Agreement, or any such representation or warranty shall prove to have been false; then in each such case Minco Silver's obligation to lend hereunder shall immediately terminate and the Outstanding Balance and the Note evidencing such advances shall be immediately due and payable upon declaration to that effect being delivered to Sterling by Minco Silver.

**5.2**    **Effect of Default.**

If any one of the Events of Default occur or occurs and is or are continuing, Minco Silver may without limitation in respect of any other rights it may have in law or pursuant to this Agreement or any other document or instrument delivered hereunder, terminate its agreement to provide funding under this agreement and demand immediate payment of all monies owing hereunder.

## 6.   GENERAL PROVISIONS

**6.1**    **Lender's Expenses.**

Sterling shall pay for Minco Silver's reasonable legal fees (on a solicitor and own client basis) and all other reasonable costs, charges and expenses (including all due diligence expenses) of and incidental to the preparation, execution and completion of this Agreement and the Security, in its sole and absolute discretion, to complete this transaction, as well as all legal fees (on a solicitor and own client basis) and all other costs, charges and expenses of and incidental to the recovery of all amounts owing hereunder, including but not limited to the enforcement of the Security. All amounts will be payable within 30 days of presentment of an invoice. If not paid within that time, such amount will be added to and form part of the principal amount of the Loan Facility and shall accrue interest from such date as if it had been advanced by Minco Silver to Sterling hereunder.

**6.2**    **Indemnity.**

Sterling agrees to indemnify and save harmless Minco Silver and each of its directors, officers, employees and agents, including Minco Silver's appointed representatives to Sterling's Board of Directors as set out in Section 3.1(d) of this Agreement from and against all liabilities, claims, losses, damages and reasonable costs and expenses in any way caused by or arising directly or indirectly from or in consequence of the occurrence of any Event of Default under this Agreement, or the Assignment.

**6.3**    **Notices:**

In this Agreement:

(a)    any notice or communication required or permitted to be given under this Agreement will be in writing and will be considered to have been given if delivered by hand, transmitted by facsimile transmission or mailed by prepaid registered post to the address or facsimile transmission number of each party set out below:

I.     if to Minco Silver
       Suite 2772 – 1055 Georgia Street
       Vancouver, British Columbia
       V6E 3P3
       Attn:  Ken Cai
       Fax: 604-688-8030

II.    if to Sterling
       Elsaesser Jarzabek Anderson Marks Elliott & Macdonald, Chtd.
       1400 Northwood Center Court, Suite C
       Coeur d'Alene, ID 83814
       Attn:  Roger Van Voorhees c/o Bruce Anderson
       Fax: 208-667-2150

or to such other address or facsimile transmission number as any party may designate in the manner set out above; and

(b)    notice or communication will be considered to have been received:

I.    if delivered by hand during business hours on a Business Day, upon receipt by a responsible representative of the receiver, and if not delivered during business hours, upon the commencement of business on the next Business Day;

II.    if sent by facsimile transmission during business hours on a Business Day, upon the sender receiving confirmation of the transmission, and if not transmitted during business hours, upon the commencement of business on the next Business Day; and

III.    if mailed by prepaid registered post upon the fifth Business Day following posting; except that, in the case of a disruption or an impending or threatened disruption in postal services every notice or communication will be delivered by hand or sent by facsimile transmission.

## 6.4    Inurnment.

This Agreement will inure to the benefit of, and be binding upon, the parties hereto and their respective successors and permitted assigns. Neither party may assign any of its rights or obligations hereunder without the other parties written consent provided however that such consent shall not be unreasonable withheld and provided further that on the occurrence of an Event of Default, Minco Silver shall not require Sterling's consent to assign any of its rights and obligations hereunder.

**6.5    Waivers.**

No failure or delay on Minco Silver's part in exercising any power or right hereunder will operate as a waiver thereof.

**6.6    Remedies are Cumulative.**

Minco Silver's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies at law or in equity.

**6.7    Time.**

Time is of the essence of this Agreement and all documents or instruments delivered hereunder

**6.8    Invalidity.**

If at any time anyone or more of the provisions hereof is or becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions hereof will not in any way be affected or impaired thereby to the fullest extent possible by law.

**6.9    Governing Laws.**

This Agreement will be governed by and interpreted in accordance with the laws of the State of Idaho and the federal laws of the United States applicable therein.

**6.10    Amendment.**

This Agreement may be varied or amended only by or pursuant to an agreement in writing signed by the parties hereto.

**6.11    Counterparts.**

This Agreement may be signed in one or more counterparts, originally or by facsimile, each such counterpart taken together will form one and the same agreement.

13

**TO EVIDENCE THEIR AGREEMENT** each of the parties has executed this Agreement on the date first above written.

**MINCO SILVER CORPORATION**                              )
                                                          )
                                                          )
Per: _____                      )                              c/s
      Authorized Signatory                )
                                                          )


**STERLING MINING COMPANY**                               )
                                                          )
                                                          )                              c/s
Per: _____                      )
      Authorized Signatory                )

14

SCHEDULE "A"

# ESCROW AGREEMENT WITH PURCHASER

Allegro Services, Inc., hereafter referred to as the Escrow Agent, holds the following documents:

| | | |
|---|---|---|
| _____ Real Estate Contract | _____ UCC Statement | Date **MARCH 27, 2009** |
| _____ Warranty Deed | _____ Sale Agreement | |
| _____ Deed of Trust and Note: Request for Reconveyance | _____ Bill of Sale | Account Number **23525** |
| _____ Unsecured Note | _____ Mobile Home Title | |
| **X** Other **LETTER REQUESTING ESCROW RE: LEASE DISPUTE** | | |

Subject to the following instructions, the documents listed above are to be delivered to the purchasers or their order, upon final and complete payment per the terms of the documents held.

Interest will be computed on a daily basis unless otherwise agreed upon by Purchaser and Vendor. Partial payments may be returned to the purchaser at the discretion of the Escrow Agent, or at the request of the Vendor. An additional service fee may be charged for the processing of partial payments. Payments are credited the day they are received by the Escrow Agent. Payments must be made before 5:00 p.m. Monday through Friday for same day crediting. Payments received after 5:00 p.m. or on Saturdays, Sundays or legal Federal or bank holidays will be credited on the next business day.

This Escrow Agreement may be cancelled at any time by the Escrow Agent after giving 30 days written notice to both Vendor and Purchaser, at which time the above mentioned documents will be returned to the closing agent. This Escrow Agreement may be cancelled upon written agreement of Vendor and Purchaser.

In the event the purchaser fails to make any payments when due or to keep and perform any other covenant or agreement contained in said escrow, and the seller has provided proof of compliance with Washington State statute concerning foreclosure, the Escrow Agent is then authorized to return all documents deposited in escrow to the Vendor or his assigns.

The Escrow Agent will deal with **MIRCO SILVER CORP** exclusively in all matters related to this escrow where purchasers are concerned. The Escrow Agent will not be liable for its acts or omissions in good faith not resulting from gross negligence. Without limiting the effect of the preceding sentence, the undersigned agree that the Escrow Agent will not be responsible for any of the following:
1. The correctness or completeness or sufficiency of any documents held in this escrow.
2. For failure to notify any party of either non-payment or declaration of default.
3. For the deposit, procurement or renewal of insurance policies or any riders or additional clauses.
4. For payment of insurance premiums or taxes (unless specifically agreed upon by the Escrow Agent to make these payments).
5. For the determination of balances to third parties or overpayment to them where instructed to make payments to persons other than Vendors.
6. For the performance of any act not expressly set forth in these escrow instructions even though contained in the documents deposited;
7. For errors, which are obvious in nature to the purchaser.

Notification sent concerning any payments due are sent as a courtesy and do not establish a requirement to send future notices.

No third party checks will be accepted. Third party checks will be returned immediately. If at any time the purchaser's payment is returned for insufficient Funds or a stop payment is issued, the Escrow Agent may, at its option require that all payments thereafter be made by cashier's check. The Escrow Agent will charge an NSF Fee to payor for any returned items. Any payment over $1000.00 shall be paid by cashier's check unless other arrangements have been made with the Escrow Agent. Any computation, application of principal and interest or other payment shall be deemed correct, unless Escrow Agent shall receive notice from a party that the calculation or the application is not correct, within 30 days after notice of such calculation or application is sent to the party affected thereby.

In the event the Escrow Agent is requested to establish a reserve account for the payment of taxes and insurance, the Escrow Agent will be calculating the amount needed to pay such amount as they become due. Payor agrees to deposit with the Escrow Agent the amount needed to pay these items, and, the necessary information needed to pay them (tax statements, insurance bill). Should the reserve account balance be insufficient at the time these items become due, and the payor has not paid the additional funds needed to pay said item or items, the Escrow Agent will not advance the funds needed to pay the item, or assume any responsibility for failure so to pay. Payor agrees to then pay any additional penalties, interest and/or liabilities which might occur. The Escrow Agent's costs, expenses, charges and attorney's fees in connection with this escrow are hereby made a first and paramount lien upon all monies, papers and things deposited in connection with this escrow, and may be deducted from funds held in trust. Escrow service fees shall be charged per the Escrow Agent's published Fee Schedule. If at any time during the life of this escrow, the Escrow Agent should make any changes in its regular schedule of charges for similar escrow accounts, it may adjust the fee provided herein to conform with said schedule.

If at any time during the life of this escrow any dispute shall arise between any of the parties or their respective successors, representatives or assigns as to the delivery by the Escrow Agent of any of the documents deposited hereunder or as to the ownership or right of possession thereto, the Escrow Agent may hold and retain in its possession without liability, any or all of the funds or papers referred to in this escrow agreement, until such dispute shall have been settled, or it may at its option, deposit such funds and papers with the Clerk of the Superior Court for Spokane County, under the appropriate statutory provisions for interpleader, and thereupon, it shall be relieved of all liability with respect thereto. The Escrow Agent shall be entitled to all reasonable attorney's fees incurred. Interest earned on reserve impound funds is the property of the Escrow Agent. Unclaimed funds of less than $25.00 shall become the property of the Escrow Agent.

The Escrow Agent may refuse to accept any assignment until the assignee signs this agreement. The Escrow Agent may refuse to accept any payment or disburse funds from any payment until both parties have signed their respective agreements with the Escrow Agent.

Due in advance, the set up fee of $ **60.00 + TAX** and the **ANNUAL** fee of $ **108.00 + TAX** shall be payable **ALL** by purchaser, for ordinary services concerning this escrow. Additional charges may be made for extra services. The full amount of fees may be taken from the first monies tendered after the due date of the fee. Escrow fees are not refundable.

Each and all of these agreements and provisions are binding upon and inure to the benefit of the successors or assigns of either party. If there is any conflict between these escrow instructions and the provisions of any of the documents held, these instructions shall govern insofar as the Escrow Agent's rights, duties and obligations are concerned. The term "Vendor" also includes Mortgagee, Beneficiary of Deed of Trust, or Payee. The term "Purchaser" also includes Mortgagor, and Grantor of Deed of Trust, or Payor.

**EACH PARTY OF THE UNDERSIGNED STATES THAT HE/SHE HAS READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO IT.**

Purchaser #1                                          Purchaser #2

15

SCHEDULE "B"

# REQUEST FOR FUNDS

TO:    MINCO SILVER CORPORATION ("Minco Silver")

FROM: STERLING MINING COMPANY ("Sterling")

RE:    POST PETITION SECURED FINANCING AGREEMENT dated the _____ day of
_____, 2009, the SUPPLEMENTAL POST PETITION SECURED FINANCING
AGREEMENT dated the _____ day of _____, 2009, and the SECOND
SUPPLEMENTAL POST PETITION SECURED FINANCING AGREEMENT dated the _____
day of _____, 2010 (the "Agreement"), between  Minco Silver Corporation and
Sterling Mining Company.

All capitalized terms used herein which are not defined herein shall have the same meaning ascribed
thereto in the Agreement.

Pursuant to Section _____ of the Agreement, the undersigned hereby provides you with an irrevocable
notice that on the date set out below the undersigned will request a draw down of the amount set out
below pursuant to the Loan Facility:

Pursuant to our Agreement of _____ we
hereby request an advance in the amount of $_____,

The funds advance will be use for the following purposes:

_____
_____
_____
_____
_____
_____

Date of Advance: _____, 20_____.

    (a) each of the representations and warranties of Sterling contained in the Agreement is true and correct in
all material respects as at the date hereof;

    (b) all of the terms, covenants and conditions contained in the Agreement to be complied with or
performed by the Sterling at or prior to the date hereof described above have been complied with or
performed; and

    (c) no Event of Default has occurred or will occur as a result of the Lender advancing the amount
described above.

Dated: _____, 20_____.

Sterling Mining Company
Per:

    _____
    President

16

SCHEDULE "C"

# SECURED PROMISSORY NOTE

$_____                              _____, 20___

      **FOR VALUE RECEIVED, STERLING MINING COMPANY,** an Idaho corporation ("**Maker**"), promises to pay to the order of Minco Silver Corporation of Suite 2772 1055 West Georgia Street, Vancouver, British Columbia V6E 3Rr, or its successors and assigns (collectively referred to herein as "**Holder**"), or at such other place as Holder may from time to time designate in writing, the principal sum of _____ ($_____) (the "**Loan**").

      INTEREST RATE. Interest shall accrue on the principal balance at the rate of ten percent (10%) per annum. The interest shall be calculated daily on the basis of a three hundred sixty (360) day year for all amounts outstanding but, in any case, shall be computed on the actual number of days in the period for which interest is charged, which period shall consist of three hundred sixty-five (365) or three hundred sixty-six (366) days on an annual basis. If any payment of interest under this Note would otherwise be due on a day which is not a business day, the payment instead shall be due on the next succeeding business day, and such extension of time shall be included in computing the interest due in respect of said payment. *Notwithstanding anything to the contrary contained herein, this Note shall bear interest starting the date Holder first wires the funds to Maker, or the date indicated above, whichever is earlier, and will end the day after this Note has been paid in full.*

      MANNER OF RE-PAYMENT. Maker shall pay to the Holder on or before June 1, 2009, and on the first day of each month thereafter during the Bankruptcy, all accrued but unpaid interest. Upon the Maturity Date (as defined below), Maker shall make a balloon payment of all interest accrued on the outstanding principal balance and the outstanding balance of the Loan. Principal and interest are payable in lawful money of the United States of America.

      MATURITY DATE. _____ from the date hereof (the "**Maturity Date**").

      LATE FEES. IF MAKER FAILS TO PAY ALL OUTSTANDING PRINCIPAL, INTEREST AND OTHER APPLICABLE FEES AND COSTS DUE AND PAYABLE ON THE MATURITY DATE, MAKER SHALL PAY A LATE CHARGE OF ONE AND ONE-HALF PERCENT (1.5%) OF THE OUTSTANDING PRINCIPAL BALANCE OF THE NOTE IMMEDIATELY AND EVERY FOURTEEN (14) DAYS AFTER THE MATURITY DATE THAT THE NOTE REMAINS UNPAID IN FULL.

      SUCH FOURTEEN (14) DAY PERIOD SHALL NOT BE CONSTRUED AS IN ANY WAY EXTENDING THE DUE DATE OF ANY PAYMENT. THE "LATE CHARGE" IS IMPOSED FOR THE PURPOSE OF DEFRAYING THE EXPENSES OF HOLDER INCIDENT TO HANDLING SUCH DELINQUENT PAYMENT. THIS CHARGE SHALL BE IN ADDITION TO, AND NOT IN LIEU OF, ANY OTHER REMEDY HOLDER MAY HAVE AND IS IN ADDITION TO ANY FEES AND CHARGES OF ANY AGENTS OR ATTORNEYS WHICH HOLDER MAY EMPLOY UPON THE OCCURRENCE OF AN EVENT OF DEFAULT (HEREINAFTER DEFINED) HEREUNDER, WHETHER AUTHORIZED HEREIN OR BY LAW.

    *Maker hereby specifically acknowledges and agrees to the fees described in the preceding capitalized two paragraphs.*

    *Initials of Roger Van Voorhees, President of Maker:* _____

      CERTAIN PROVISIONS REGARDING PAYMENTS. All payments made as scheduled on this Note shall be applied, to the extent thereof, to late charges, to accrued but unpaid interest, unpaid

17

principal, and any other sums due and unpaid to Holder under the Loan Documents, in such manner and order as Holder may elect in its sole discretion. All permitted prepayments on this Note shall be applied, to the extent thereof, to accrued but unpaid interest on the amount prepaid, to the remaining principal installments, and any other sums due and unpaid to Holder under the Loan Documents, in such manner and order as Holder may elect in its sole discretion, including but not limited to application to principal installments in inverse order of maturity. Except to the extent that specific provisions are set forth in this Note or another Loan Document with respect to application of payments, all payments received by Holder shall be applied, to the extent thereof, to the indebtedness secured by the Mortgage in such manner and order as Holder may elect in its sole discretion, any instructions from Maker or anyone else to the contrary notwithstanding. Remittances in payment of any part of the indebtedness other than in the required amount in immediately available U.S. funds shall not, regardless of any receipt or credit issued therefore, constitute payment until the required amount is actually received by Holder in immediately available U.S. funds and shall be made without offset, demand, counterclaim, deduction, or recoupment (each of which is hereby waived) and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by the holder hereof of any payment in an amount less than the amount then due on any indebtedness shall be deemed an acceptance on account only, notwithstanding any notation on or accompanying such partial payment to the contrary, and shall not in any way excuse the existence of an Event of Default.

PREPAYMENT. If any prepayment of all or any portion of the principal balance hereunder occurs, whether in connection with Holder's acceleration of the unpaid principal balance of the Note or in any other circumstances whatsoever, or if this Note is satisfied or released by the US Bankruptcy Court or by other means then Maker shall therewith pay the Prepayment Consideration. The foregoing shall not create any right of prepayment. Maker shall have no right whatsoever to prepay all or any portion of the principal balance of the Note, except only as follows:

(i) Maker shall have the right to prepay and shall not be required to pay any Prepayment Consideration with respect to prepayment required by Holder pursuant to the Instrument as a result of the application of insurance proceeds or condemnation awards under the Instrument or as a result of prepayment of the entire principal balance of the Note remaining due after the application of insurance proceeds or condemnation awards under the Instrument, provided that such prepayment of the entire principal balance of the Note remaining due is made within ten (10) days following the date of such application; and

(ii) Further, provided Maker is not in default hereunder or under any of the Loan Documents and provides not less than ten (10) days prior written notice, Maker shall have the right to pay all (but not less than all) obligations then outstanding under the Loan Documents, including the prepayment of all principal, within the two (2) month period immediately prior to the Maturity Date. In such case, there shall be no Prepayment Consideration due.

The "Prepayment Consideration" shall be the amount equal to the amount of the monthly interest the Holder would earn if the principal balance being prepaid were outstanding for sixty (60) days from the date hereof, less interest already paid.

PURPOSE. Maker represents and warrants that the Loan is being made solely for the purposes as set out in Section 2.3 of the Postpetition Secured Financing Agreement. The Maker further warrants that all of the proceeds of this Note shall be used for commercial purposes and stipulates that the Loan shall be construed for all purposes as a commercial loan, and is made for other than personal, family, household or agricultural purposes.

SECURITY; LOAN DOCUMENTS. The obligations of Maker under this Note are secured by a priority secured interest ("Priority Interest") over all of the Maker's collateral (the "Collateral" as referred to and defined in the

18

Postpetition Secured Financing Agreement including the Sunshine Lease owned by the Maker, and on certain parcels of real property located in Shoshone County, Idaho. ).  The Priority Interest shall be a priority interest lien subject to valid existing liens on said Collateral. This Note, the Priority Interest, and all other documents or agreement that govern, evidence, secure or otherwise relate to this Note, or the loan evidenced hereunder, are referred to herein as the **"Loan Documents."**

EVENTS OF DEFAULT.  The occurrence of any of the following shall be deemed to be an event of default (**"Event of Default"**) hereunder:

a.   Failure to make any payment as herein provided immediately when due.

b.   The failure of Maker to timely satisfy any of the covenants and conditions set forth in this Note or other Loan Documents.

c.   The occurrence of a default or an event of default under the Mortgage or other Loan Documents.

d.   Any representation or warranty by Maker in any Loan Document is materially false, incorrect, or misleading as of the date made.

e.   The occurrence of any event that reasonably, materially and adversely affects the ability of Maker to perform any of its obligations under the Loan Documents.

f.   Maker (i) is unable to or admits in writing its inability to pay Maker's monetary obligations as they become due, (ii) fails to pay when due any monetary obligation, whether such obligation be direct or contingent, to any person in excess of One Hundred Fifty Thousand Dollars ($150,000.00), unless such obligation is being contested in good faith, as determined by Holder in its reasonable discretion (iii) makes a general assignment for the benefit of creditors,

g.   The Maker shall cease to be operated pursuant to chapter 11 of the Bankruptcy Code, an order shall be entered pursuant to section 1104 of the Bankruptcy Code appointing a trustee for the Maker, or an order shall be entered directing liquidation of the Maker pursuant to chapter 7 of the Code,

h.   All or any part of the property of Maker or any Guarantor is materially attached, levied upon, or otherwise seized by legal process, and such material attachment, levy, or seizure is not quashed, stayed, or released within twenty (20) days after the date thereof.

ACCELERATION.  Upon the occurrence of an Event of Default, Holder shall have the right, with five (5) days notice to Maker, to immediately accelerate the Note and enforce its remedies hereunder or pursuant to the Priority Interest.  No provisions of this Note may be changed, discharged, terminated, or waived except in a writing signed by the party against whom enforcement of the change, discharge, termination, or waiver is sought.  No failure on the part of the Holder to exercise and no delay of Holder in exercising any right or remedy under this Note or under the law shall operate as a waiver thereof.

ATTORNEYS' FEES; OTHER COLLECTION FEES.  If this Note is not paid when due upon maturity or acceleration or if any Event of Default occurs, Maker promises to pay all costs of enforcement and collection and preparation therefore, including but not limited to, reasonable attorneys' fees, whether or not any action or proceeding is brought to enforce the provisions hereof.

NOTICE OR DEMAND.  Maker hereby waives diligence, demand for payment, presentation for payment, notice of nonpayment, protest, notice to protest, notice of intent to accelerate, notice of acceleration, notice of dishonor, and all other notices or demands of any kind (except notices specifically provided for in this Note) and expressly agrees that, without any way affecting the liability of Maker, Holder may extend any maturity date or the time for payment of any installment due hereunder, otherwise modify this Note, accept additional security, release any person liable, and release any security or guaranty.

NATURE OF LOAN; COMPLIANCE WITH USURY LAWS.  The loan evidenced by the Note is being made solely for the purpose of carrying on or acquiring a business or commercial enterprise.  It is the intent of Maker and Holder and all other parties to the Loan Documents to conform to and contract in strict compliance with applicable usury law from time to time in effect.  All agreements between Holder and Maker (or any other party liable with respect to any indebtedness under the Loan Documents) are hereby limited by the provisions of this Section

19

which shall override and control all such agreements, whether now existing or hereafter arising. In no way, nor in any event or contingency (including but not limited to prepayment, default, demand for payment, or acceleration of the maturity of any obligation), shall the interest taken, reserved, contracted for, charged, chargeable, or received under this Note, the Priority Interest, or any other Loan Document or otherwise, exceed the maximum nonusurious amount permitted by applicable law (the "Maximum Amount"). If, from any possible construction of any document, interest would otherwise be payable in excess of the Maximum Amount, any such construction shall be subject to the provisions of this Section and such document shall ipso facto be automatically reformed and the interest payable shall be automatically reduced to the Maximum Amount, without the necessity of execution of any amendment or new document. If Holder shall ever receive anything of value which is characterized as interest under applicable law and which would apart from this provision be in excess of the Maximum Amount, an amount equal to the amount which would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the Loan in the inverse order of its maturity and not to the payment of interest, or refunded to Maker or the other payor thereof if and to the extent such amount which would have been excessive exceeds such unpaid principal. The right to accelerate maturity of the Note or any other Secured Indebtedness does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Holder does not intend to charge or receive any unearned interest in the event of acceleration. All interest paid or agreed to be paid to Holder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term (including any renewal or extension) of such indebtedness so that the amount of interest on account of such indebtedness does not exceed the Maximum Amount. As used in this Section, the term "applicable law" shall mean the laws of the State of Utah or the federal laws of the United States applicable to this transaction, whichever laws allow the greater interest, as such laws now exist or may be changed or amended or come into effect in the future.

SEVERABILITY. If any provision of this Note is unenforceable the enforceability of the other provisions shall not be affected and they shall remain in full force and effect. In this Note the singular shall include the plural and the masculine shall include the feminine and neuter gender, and vice versa.

JURISDICTION. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUCTED IN ACCORDANCE WITH THE LAWS OF THE STATE OF IDAHO WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES and all persons and entities in any manner obligated under this Note consent to the jurisdiction of any federal or state court within the State of Idaho having proper venue and also consent to service of process by any means authorized by Idaho or federal law with respect to any dispute or controversy hereunder or any action to enforce the terms thereof.

WAIVER OF JURY TRIAL. MAKER WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH MAKER AND HOLDER MAY BE PARTIES, ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY PERTAINING TO, THIS NOTE, THE LOAN AGREEMENT, THE MORTGAGE OR ANY OF THE OTHER LOAN DOCUMENTS. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTION OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS NOTE. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY MAKER AND MAKER HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. MAKER FURTHER REPRESENTS AND WARRANTS THAT IT HAS BEEN

REPRESENTED IN THE SIGNING OF THIS NOTE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH LEGAL COUNSEL.

1.    SERVICE OF PROCESS.  Maker hereby irrevocably designates and appoints Bruce Anderson of Elsaesser Jarzabek Anderson Marks & Elliott, Chtd. 1400 Northwood Center Court, Suite C Coeur d'Alene, ID 83814, as Maker's authorized agent to accept and acknowledge on Maker's behalf service of any and all process that may be served in any suit, action, or proceeding instituted in connection with this Note in any state or federal court sitting in the State of Idaho.  If such agent shall cease so to act, Maker shall irrevocably designate and appoint without delay another such agent in the State of Idaho satisfactory to Holder and shall promptly deliver to Holder evidence in writing of such agent's acceptance of such appointment and its agreement that such appointment shall be irrevocable.

ENTIRE AGREEMENT. The Note and the other Loan Documents contain the complete understanding and agreement of Maker and Holder and supersede all prior representations, warranties, agreements, arrangements, understandings, and negotiations.  **MAKER IS NOTIFIED THAT THIS NOTE AND OTHER WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OR ANY ALLEGED PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENT OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

ADDITIONAL COVENANTS.  In addition to the foregoing terms and provisions of the Note, the Maker covenants and agrees to comply with the following covenants and conditions:

(a)    Financial Reporting Covenants.  Maker shall provide to Holder the following:

(i)    Maker shall provide information concerning Maker's assets, business, financial condition, operations, property, prospects, and results of operations of Maker as Holder reasonably requests from time to time, including but not limited to, monthly sales data, sale contracts, and appraisals for the Property.

IN WITNESS WHEREOF, Maker has executed and delivered this Note as of the day and year first above written.

**MAKER:**

**STERLING MINING COMPANY,**
an Idaho corporation

Signature: _____
By:  Roger Van Voorhees
Its:  President
EIN #:_____ - _____
Business Phone #: (      ) _____ - _____
Email Address: _____
Office Address:
2201 Government Way, Suite E,
Coeur d'Alene, Idaho 83814

## ACKNOWLEDGEMENT

STATE OF _____    )
                                               : ss
COUNTY OF _____    )

On the _____ day of _____ in the year 2010, before me, the undersigned, personally appeared  Roger Van Voorhees, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the persons upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the State of _____, County of _____.

Notary Public in and for _____
Residing at:_____
My Commission Expires:_____

22

**SCHEDULE "D"**

**SIX-MONTH POST-PETITION CASH PROJECTIONS**

Case No.  09-20178

Debtor  Sterling Mining Company

| | February | March | April | May |
|---|---|---|---|---|
| Beg. Cash Balance: | 52,689 | 178,647 | 36,056 | 37,838 |
| | | | | |
| **Cash Receipts** | | | | |
| Cash Sales | | | | |
| Lease Income | 450 | 450 | 450 | 450 |
| Sale of Assets | | | | |
| Post-Petition Borrowing - this request | 546,956 | | | |
| Other: Allegro Escrow | 80,000 | | | |
| Other: 1/19 Funding Request | 300,000 | | | |
| Post Petition Borrowing | | | | |
| Additional DIP Shortfall | | 1,500,000 | 250,000 | 250,000 |
| | | | | |
| **Total Cash Receipts** | 927,406 | 1,500,450 | 250,450 | 250,450 |
| | | | | |
| | | | | |
| **Cash Disbursements** | | | | |
| Outstanding PO's as of 2/1/10 | 11,210 | - | - | - |
| Auto/Truck Expense | 1,000 | 1,000 | 1,000 | 1,000 |
| Employee Benefits | 15,500 | 15,500 | 15,500 | 15,500 |
| Insurance | 11,500 | 11,500 | 11,500 | 11,500 |
| D&O Insurance | | | | |
| Inventory Purchases | | | | |
| Officers Salaries | 2,500 | 2,500 | 2,500 | 2,500 |
| Other Salaries/Wages | 52,762 | 63,896 | 61,118 | 55,562 |
| Payroll Taxes | 9,133 | 10,815 | 10,345 | 9,405 |
| Rent/Lease Payments - CdA | 1,955 | 1,955 | 1,955 | 1,955 |
| Repairs/Maint. | 7,500 | 7,500 | 7,500 | 7,500 |
| Tailings Pond Treatment | 5,000 | 5,000 | 5,000 | 5,000 |
| NPDES Testing | 4,000 | - | 4,000 | 4,000 |
| Secured Debt Payments | | | | |
| Mine Claim Fees BLM | | | | |
| Supplies | 500 | 500 | 500 | 500 |
| Central Mine Rescue | 1,000 | 1,000 | 1,000 | 1,000 |
| Utilities (power, phone, net, etc.) | 47,500 | 47,500 | 47,500 | 47,500 |
| Professional Fees (CC, adnet, R&T, vw) | 1,750 | 1,500 | 1,500 | 1,500 |
| USTrustee Quarterly Fees | - | | 4,875 | |
| Safety Consult (RM) | 1,800 | 1,800 | 1,800 | 1,800 |
| Acct Services (JM, LM) | 11,600 | 8,600 | 8,600 | 3,200 |
| Sunshine Mine Lease - SPMI | 10,000 | 10,000 | 10,000 | 10,000 |
| Chester Lease | 600 | 600 | 600 | 600 |
| Metropolitan Lease | 1,000 | 1,000 | 1,000 | 1,000 |
| Mineral Mountain Lease | 3,600 | - | - | - |
| Merger Lease | | | | |
| Rock Creek Lease | 500 | 500 | 500 | 500 |
| Western Continental | | | | |
| Other: Property Taxes | - | - | - | - |
| Other: Office Equip Rent | 375 | 375 | 375 | 375 |
| | | | | |
| **Defaults / Legal** | | | | |
| Chester Lease | 6,600 | | | |
| Metropolitan Lease | 6,000 | | | |
| Mineral Mountain Lease | 3,600 | | | |
| Rock Creek Lease | 3,000 | | | |
| Default Cure - Shoshone Co. Taxes | 96,227 | - | - | - |
| Default Cure - SNS | 195,836 | - | - | - |
| Default Cure - Avista Pre-Petition | 177,900 | - | - | - |
| Default Cure - SPMI Lease 3/09 - 1/10 | 110,000 | - | - | - |
| EPA/Tribe - Legal Settlement | | 1,250,000 | | |
| Attorneys 11/01 to 2/28 | | 200,000 | 50,000 | 50,000 |
| | | | | |
| **Total Cash Disbursement** | 801,448 | 1,643,041 | 248,668 | 231,897 |
| | | | | |
| | | | | |
| **Net Cash Flow** | 125,958 | (142,591) | 1,782 | 18,553 |
| | | | | |
| | | | | |
| **Ending Cash Balance** | 178,647 | 36,056 | 37,838 | 56,391 |

Sterling Mining Company
1304 GL Recon A/R Other

| | 3-60 Days | Total |
|---|---|---|
| Anthony Lasco | 393.29 | 393.29 |
| Chuck Wilcox | 520.00 | 520.00 |
| Coeur Silver Valley Inc. | 360.00 | 360.00 |
| David Ross | 507.66 | 507.66 |
| Historic Jameson | 394.00 | 394.00 |
| Lance Stanley | 9,220.00 | 9,220.00 |
| Mike Dahl | 1,000.00 | 1,000.00 |
| Silver Valley Capital | 912.00 | 912.00 |
| Silver Valley Mining Assoc. | 4,476.00 | 4,476.00 |
| Sunshine Gallery | 575.00 | 575.00 |
| Sweets Lounge | 266.00 | 266.00 |
| Transborder Solutions | 764.26 | 764.26 |
| Ute Kopseiler | 2,000.00 | 2,000.00 |
| | 16,058.41 | 16,058.41 |

Accounts Receivable Coins
Recon At 12-31-08
2-1801                      12R

| | 7-80 Days | Total |
|---|---|---|
| Bob Hopner | 350.00 | 350.00 |
| Brooks Hotel | 450.00 | 450.00 |
| Cash Sale | 350.00 | 350.00 |
| Chuck Wilcox | 310.00 | 310.00 |
| Coin Nuts | 432.50 | 432.50 |
| David Rausch | 230.00 | 230.00 |
| DeAnne Dwyer | 140.00 | 140.00 |
| Eric Buckingham | 280.00 | 280.00 |
| Ellen Fait | 89.12 | 89.12 |
| Frank Seatz | 440.00 | 440.00 |
| Historic Jameson | 1,900.00 | 1,900.00 |
| Idaho Silver Shop | 477.50 | 477.50 |
| Intaglio Tablet | 4,457.50 | 4,457.50 |
| Jack Meeks | 240.00 | 240.00 |
| Jameson, Inc | 3,427.50 | 3,427.50 |
| Jason Cunnington | 65.00 | 65.00 |
| Jeff Mellon | 60.00 | 60.00 |
| Jerome Bunds | 2,693.60 | 2,693.60 |
| John Rayburn | 60.00 | 60.00 |
| Kirk Nelson | 120.00 | 120.00 |
| Larry Jennings | 240.00 | 240.00 |
| Lloyd Eck | 500.00 | 500.00 |
| Michael Stewart | 100.00 | 100.00 |
| Patrick Johnson | 100.00 | 100.00 |
| Philip Fait | 20.00 | 20.00 |
| R. Dunkofske | 500.00 | 500.00 |
| Silver Valley Capital | 10,058.84 | 10,058.84 |
| Silver Valley Mining Assoc. | 2,748.50 | 2,748.50 |
| Staff House Museum | 710.00 | 710.00 |
| Sterling Mining - Investor Relations | 20.00 | 20.00 |
| Sterling Mining Employees | 20.00 | 20.00 |
| Sunshine Gallery | 2,404.00 | 2,404.00 |
| Sweets Lounge | 340.50 | 340.50 |
| Total at 12-31-07 | 33,167.56 | 33,167.56 |

Total Receivable at Bankruptcy:    49,225.97    49,225.97

Discount                                           59.9%

Receivable                                       20,040.38

Exhibit C